**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Ronnie D. MOORE, Defendant-Appellant.**

**No. 80–1832.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 12, 1982.

Decided April 13, 1982.

Rehearing and Rehearing En Banc
Denied July 12, 1982.

William W. Swor, Detroit, Mich., for defendant-appellant.

Leonard Gilman, U. S. Atty., Gary Felder, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee.

Before EDWARDS, Chief Judge, LIVELY and KEITH, Circuit Judges.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

This case presents, with some variations, the airport stop and search problems with which this court has dealt in *United States v. McCaleb*, 552 F.2d 717 (6th Cir. 1977), *United States v. Mendenhall*, 596 F.2d 706 (6th Cir. 1979) *rev'd*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), and *United States v. Jefferson*, 650 F.2d 854 (6th Cir. 1981). In each of the cases cited above, this court and the Supreme Court in *Mendenhall* has dealt with three separate phases of Fourth Amendment concerns. The first relates to the approach or stop of a citizen by a police officer. The second concerns voluntary surrender or involuntary seizure of drugs. The third concerns arrest.

Thus far, it is rare indeed for drug enforcement agents to employ search warrants in these and similar cases. As the facts in this case will indicate, opportunity for employment of the provisions under federal law for law enforcement officials to procure search warrants by telephone would have been difficult if not impossible, in spite of ready availability of Magistrates on duty in the vicinity of most major airports.

Our instant case opens with four drug enforcement agents on duty at the Detroit Metropolitan Airport when a Delta flight from Fort Lauderdale, Florida landed. Two of the agents, Dunn and McCoy, both experienced in drug enforcement work observed the passengers landing from this flight presumably because of knowledge that drug couriers frequently arrived on planes from Florida, particularly Miami and Fort Lauderdale. The agents' attention to appellant Moore was occasioned by the fact that appellant disembarked from the Delta flight among the first of the passengers. This suggested to the agents that he had traveled first class, as they assert is common for drug couriers. Additionally, Agent Dunn testified that as appellant deplaned, he was "paying particular attention to people in the flight area but he was doing this in a furtive manner and that he continued similar observations of people passing him

when he stopped and made brief use of a pillar telephone." The agents' interest in appellant was heightened when he walked by the steps to the lower level baggage area and continued down the corridor to an adjacent terminal without claiming any baggage.

In the American Airlines portion of the building, appellant was seen to take an escalator to the ground level and start to approach the taxi line there. What happened next is, as we see it, critical to the outcome of this case and we will quote the only testimony which deals with the original contact.

Q  And in approaching Mr. Moore, would tell the Court what took place?

A  Yes, sir.

I showed Mr. Moore my badge and I identified myself and asked him if I could talk with him a minute.

Q  And did he respond to your request to talk with him?

A  Yes; he said that I could.

Q  And this was, again, outside the terminal in the public area?

A  Yes; it was at the—on the sidewalk near the, near the road.

Q  And how were you dressed, Agent Dunn?

A  I don't know, just in casual clothes, sport shirt, trousers, jacket.

Q  How was Agent McCoy dressed?

A  Similar to the way I was dressed.

Q  And did you display any weapon this initial approach?

A  No, I did not.

Q  Did Agent McCoy?

A  No.

Q  Did you or Agent McCoy, in anyway, have to physically restrain the defendant on this approach?

A  No.

Q  No, after he gave you permission to speak with him, what occurred then?

A  I asked him if he had any identification and Mr. Moore said that he did and I

asked him if I could see it, and he found his driver's license, driver's license and handed it to me.

I took him it from him. I saw, noted his name and noted it was a Michigan driver's license and saw that Mr. Moore was—his hands were trembling, to some extent, not a lot. I thought that he was nervous. I then returned Mr. Moore's driver's license to him and I asked him some further questions.

Q And what questions did you ask him?

A I asked Mr. Moore if he was at the airport to catch a flight out of Detroit or if he had just arrived from another city.

Q And did you receive a response?

A Yes. Mr. Moore said he had come to the airport to catch a flight, a flight out, but that he had missed the flight and he was going back home.

Q And how did you respond?

A I asked Mr. Moore, "Are you telling me that you just didn't get off the flight from Florida?" And he said not that he recalled—

Q Next—

THE COURT: Is that what he said?

THE WITNESS: "Not that I recall."

THE COURT: "Not that I recall?"

THE WITNESS: Yes.

Q (By Mr. Felder): What next took place, Mr. Dunn?

A At that point I told Mr. Moore, myself and Agent McCoy were federal narcotic agents, and that we were looking for persons bringing narcotics into the Detroit area through the airport, and I asked him if he had any narcotics and he he said that he didn't.

I asked him if he had any narcotics in his briefcase, or on his person; he said that he didn't, and I asked him if he would object to a search of his briefcase, and he said that he would not.

Q And then what took place?

A Then, I suggested to Mr. Moore if he would consent to a search, that I'd do the search back inside the terminal, out of the very public area that we were in on the sidewalk, outside, to save some embarrassment on either his part or my part.

Q And did Mr. Moore respond to that request?

A Yes. He said that he would go back inside the terminal with me.

\* \* \* \* \* \*

Q And prior to going back into the terminal, you gave back to Mr. Moore his I.D., his driver's license?

A Driver's license, yes.

Q Now, inside the terminal, Special Agent Dunn, what took place then?

A Well, Mr. Moore—I explained to Mr. Moore that he didn't have to allow a search of his briefcase if he didn't want to. Mr. Moore said, again, said I could look in his briefcase.

He unlocked it, and it was a combination lock briefcase. He unlocked the briefcase; it was placed on the floor and he began— Mr. Moore began to open it. I asked him not to open it, not to open it himself, I preferred to open it myself.

\* \* \* \* \* \*

Q Special Agent Dunn, prior to your opening the briefcase, at any time, did you ask Mr. Moore for airline tickets?

A Yes.

Q Where did that occur?

A On the sidewalk, outside, during my initial conversation with him.

Q And did he, did he show you any airline ticket?

A No. This was after I'd asked him the question about whether he was arriving or whether he was at the airport to take a flight out and he told me he had missed his flight.

I asked him, at that point, if he had and airline—his airline ticket with him and he said that he didn't.

THE COURT: He said what?

THE WITNESS: He said he didn't.

Q (By Mr. Felder): Directing your attention back to where you were opening his

briefcase at the terminal, what occurred then?.

A I opened the briefcase, saw it had minimal contents; two shirts that appeared—that were like new, that appeared like just had been bought, had some printing about Florida on them.

* * * * * *

A Saw there was and absence of a change of clothing even; saw an airline ticket in the name of Mr. Moore, Ronnie Moore; it was for Delta Airline flight 1148 from Fort Lauderdale, to Detroit, first class, and there was—

Q That was the flight you you saw him deplane?

A Yes, sir.

Q Continue please.

A And had date stamp, date of issue that's put on by Delta Airlines which sold it, which was the same date, March 6th, indicating it had been bought by Mr. Moore earlier that day.

I also saw two, two pieces of paper which had some notations, numerals, figures, multiplication, adding, subtraction. One, in particular, I interpreted to be narcotics related.

Q Special Agent Dunn, with regard to the ticket you observed, would you tell the Court, if applicable, what indicators or indications you got from the tickets and the drug courier profiles?

A Well, the fact that Mr. Moore was coming from Fort Lauderdale which was— which I knew before hand. But, the fact it was a first class ticket, and the fact that it had been purchased earlier that day, were both consistent with narcotic courier characteristics.

* * * * * *

Q And with regards to the sheet, inside the briefcase that you stated had numerals on it that were indicative of narcotics, would you be a little more specific regarding that?

A Yes. Just numbers appeared to be additions and multiplications. There were no notations next to the numbers. They were random, randomly written. One of the papers that the writing was on was Delta Airlines stationery.

So it was, I assume, Mr. Moore had made notations on—either on the way to Fort Lauderdale or back from Fort Lauderdale. And there was one, in particular, it was a multiplication stating it was 1800 times, and then there was another figure and—I believe it was 10 or 12, and the reason I associated that particular computation with narcotics is because—well, cocaine which is the, for which Miami and Fort Lauderdale are the source area, roughly sells for $1,800.00, $2,200.00 an ounce.

Q And after you made these observations of the contents of the briefcase, Special Agent Dunn, what next did you do?

A I told Mr. Moore, "Well, everything seems to be in order;" closed the briefcase and Mr. Moore seemed to—he was relaxed at that point.

I said "Mr. Moore, the nature of narcotics being what they are, they're small, they're easy to would you mind if I pated you down?"

At that time, Mr. Moore began to tremble tremble, his hands began to tremble. He answered me but he had difficulty in finding the words to answer me. In essence, he said that he objected objected to a pat down of his person.

Q Would you say, at this point in time, his demeanor was—he indicated more nervousness at this point in time than earlier?

A Yes, he did.

Q What then occurred?

A I said "Mr. Moore, I really believe that you're in possession of narcotics," and Mr. Moore did not answer me, he tried to say something, he was speechless, really, and he just, his, his head was trembling, his hands were shaking and, and I told Mr. Moore, I advised him he was under arrest.

Q And after advising Mr. Moore that he was under arrest, what did you do then?

A I immediately told him that he didn't have to say anything; if he did say anything it could be used against him in court

and he had a right to an attorney and if he couldn't afford an attorney, one would be appointed for him.

I said "Now I'm going to have to pat you pat you down," which I did.

Q And upon patting down Mr. Moore, what did you observe, if anything?

A I found in his coat pocket, a package contained in two cloths which were turned end-to-end and in the package was a white powdery substance in plastic bags.

I then handed the bags to one of the other agents who was assisting me at that time, I believe it was Agent Bryda, and continued the arrest pat down of Mr. Moore.

Then I accompanied Mr. Moore to the D.E.A. office at the airport.

Q After Mr. Moore was taken to the office, at the airport, what occurred there, if anything?

A Well, there was—Mr. Moore was processed; that is, his personal history background information was obtained, name, telephone number, address, Social Security number, things of that nature.

He was formally advised of his Constitutional Rights by a printed form, which is available and is routinely given to an arrested person to read and he was fingerprinted and photographed.

Q At this time, or during this period of time, did Mr. Moore make any statements?

A Yes. He made a statement to—more directed to Agent McCoy because Agent McCoy was taking down Mr. Moore's personal history and discussing his rights with him.

Q Did you hear the statements?

A Yes, I heard the statements. I can't relate them verbatim as they were said, but in essence, statement were, "You got me, I'm guilty, I'm guilty as hell, I've lost everything; I sold my house, I made a profit on my house.

I believe the figure was $47,000.00 that Mr. Moore sold his house for; I think he said he made an $18,000.00 profit; he used that money to—when he went to Florida,

and since we got him, he lost everything that he had.

Q The substance, the white powdery substance, at that time, or shortly thereafter was field tested, I take I take it?

A Yes. It was field tested after myself and the other agents got back to the office and it was a positive reaction for cocaine.

THE COURT: How much was it?

THE WITNESS: 220 grams.

Cross examination by appellant's attorney only served to emphasize most of these facts but it did develop the following additional facts:

Q Did you say, did you advise him that he didn't have to speak with you?

A. No.

Q Did you advise him that he could leave?

A No.

Further, appellant's counsel developed the following:

Q Did you advise Mr. Moore that he had a right to refuse to be searched or patted down?

A Yes; when we first come back inside, prior to conducting the search of his briefcase, I said "You don't—you don't have to let us look into your briefcase if you don't want to."

Q Did you give him the same advice when you asked him about patting him down?

A No.

Q He refused to let you search him?

A Yes.

Q And that is when you arrested him?

A At that point, yes.

Q Was Mr. Moore free to leave when you approached him at the curb?

If he had walked away from you, would you have just let him go?

A (Pause.) I, I don't really know. I'd have to be presented with the situation then and there.

Although two other agents testified before the District Judge, no additional relevant information was adduced except for

the following testimony which pertains to a statement made by appellant immediately after appellant signed a document stating that he had been advised of his constitutional rights:

Q (By Mr. Felder): Special Agent McCoy, after you—Defendant Moore signed that document, did he make any statements?

A Yes, he blurted out a statement.

Q You say he blurted out a statement?

A I, more or less, stared at him for a half a minute after I had him sign.

THE COURT: You did what, you say?

THE WITNESS: I looked straight at him for about a half a minute and didn't say anything to him.

THE COURT: Go ahead.

Q (By Mr. Felder): And what did he blurt out, as you say?

A I have these notes here which I took and wrote down about five minutes after he blurted out the statement.

He said "D.E.A. got him—

THE COURT: Said what?

THE WITNESS: Said "We got it, I'm as guilty as hell and he sold a house last April for 47,000 made an $18,000.00 profit;" that he lost everything when we caught him, he lost everything.

Then I asked him when he went to Florida. He said he went that day to Florida and I asked him if he wanted to help himself out of this mess by telling of others involved.

He said he could not give anybody else up, as he did it all by himself.

As to the legality of the approach or stop, however it may be described, we note a decided distinction between this case and the facts of *United States v. Jefferson.* In the *Jefferson* case, this court said:

In this case, Agent Markonni did not merely stop Jefferson to ask him a few questions; he stopped him and immediately after identifying himself as a DEA agent requested Jefferson to accompany him to the baggage claims office. In these circumstances, Jefferson could not reasonably believe that he was free to leave.[1] This was a "seizure" within the meaning of the Fourth Amendment.

[1] We note that Justice Stewart's opinion in *Mendenhall* was joined in by only Justice Rehnquist. Justice Powell's concurring opinion was joined in by the Chief Justice and by Justice Blackmun, and in that opinion he stated: "For me, the question whether the respondent in this case reasonably could have thought she was free to 'walk away' when asked by two government agents for her driver's license and ticket is extremely close." 446 U.S. at 560 n.1, 100 S.Ct. at 1880 n.1 (Powell, J., concurring). Justice Powell believed the agents had probable cause to justify the stop whether or not it was a seizure. Four Justices believed that the brief stop to ask for identification was a "seizure." *See also, Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (defendant who was picked up for a custodial interrogation was "seized" within the meaning of the Fourth Amendment).

*United States v. Jefferson,* 650 F.2d 854, 856 (6th Cir. 1981).

In contrast to our instant case, the drug enforcement agent testified that he asked appellant whether he could ask him a few questions and received an affirmative answer.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the court said in a footnote:

We thus decide nothing today concerning the constitutional propriety of an investigative "seizure" upon less than probable cause for purposes of "detention" and/or interrogation. Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred. We cannot tell with any certainty upon this record whether any such "seizure" took place here prior to Officer McFadden's initiation of physical contact for purposes of searching Terry for weapons, and we thus may assume that up to that point no intrusion upon constitutionally protected rights had occurred.

392 U.S. at 19 n.16, 88 S.Ct. at 1879 n.16.

Paraphrasing this discussion of "seizure" as opposed to "personal inter-

course between policemen and citizens," we would observe about the drug enforcement agents' approach to appellant in this case that the apparently non-threatening approach, "Can I ask you a few questions?" serves to distinguish this case from *Jefferson*. This is of critical importance because at the time appellant agreed to answer questions and likewise agreed to open his briefcase, the drug enforcement agents did not have probable cause for arrest or seizure. There are doubtless many totally innocent citizens who leave planes among the first passengers and who walk through the terminal looking about them in a fashion which a drug enforcement agent could construe as being nervous and who take a circuitous route perhaps by sheer mistake rather than by an attempt to evade. Although good police work might suggest close observance of someone who left a plane in Detroit which had just come from a major drug supply center in Florida, such facts as are shown here did not constitute reasonable suspicion of criminal activity. See *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).

What followed the initial contact, however, gave the drug enforcement agents positive knowledge that appellant had lied in denying his arrival by the Delta morning flight from Fort Lauderdale. The ticket in the briefcase confirmed his first class status which previously had been an educated surmise. The numbers on the Delta stationery corresponded with the agents' knowledge of the price of cocaine in Florida.

In short, by the time appellant refused to permit a search of his person, the facts require us to hold that the agents had evidence which constituted probable cause to believe that appellant was carrying drugs.

The judgment of conviction is affirmed.