**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Delphine O. TOLBERT,
Defendant-Appellee.**

No. 81–1485.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 31, 1982.

Decided Nov. 11, 1982.

Leonard R. Gilman, U.S. Atty., Gary M. Felder, Asst. U.S. Atty., James McCarthy, Detroit, Mich., for plaintiff-appellant.

Isaiah B. King, Houston, Tex., for defendant-appellee.

Before KENNEDY and KRUPANSKY, Circuit Judges, and RUBIN, District Judge.*

KRUPANSKY, Circuit Judge.

This is an appeal from an Order of the District Court for the Eastern District of Michigan suppressing certain evidence relating to the criminal prosecution of Delphine O. Tolbert (Tolbert) for possession with intent to distribute cocaine. 21 U.S.C. § 841(a)(1). The matter is properly before this Court pursuant to 18 U.S.C. § 3731.[1]

The circumstances of this case once again require this Court to assess the constitutionality of the conduct of law enforcement agents preceding an arrest at an airport.[2]

---

* The Honorable Carl B. Rubin, Chief Judge, United States District Court for the Southern District of Ohio, sitting by designation.

1. 18 U.S.C. § 3731 provides, in pertinent part:
    An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

2. This Circuit has addressed this problem under a variety of factual settings. *See United States v. Nembhard,* 676 F.2d 193 (6th Cir. 1982); *United States v. Moore,* 675 F.2d 802 (6th Cir.1982); *United States v. Jefferson,* 650 F.2d 854 (6th Cir.1981); *United States v. Garrett,* 627 F.2d 14 (6th Cir.1980); *United States v. Andrews,* 600 F.2d 563 (6th Cir.) *cert. denied,* 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979); *United States v. Smith,* 572 F.2d 1182

Because "[e]ach case raising a Fourth Amendment issue must be judged on its own facts," *United States v. Mendenhall,* 446 U.S. 544, 554 n. 6, 100 S.Ct. 1870, 1883 n. 6, 64 L.Ed.2d 497 (1980) (Powell, J. concurring), a somewhat lengthy recitation of the facts is necessary.

The lower court's factual findings, reflecting in large measure the stipulations of the parties, reveal the following chronology. On March 28, 1980, Tolbert arrived at the Atlanta, Georgia airport via a commercial airline flight originating in Miami, Florida. As she deplaned, she was observed by Special Agent Gerald Chapman (Chapman) of the Drug Enforcement Agency (DEA) and Officer James Burkhalter (Burkhalter) of the Atlanta Police Department. Chapman noted that Tolbert viewed him with concern as she left the plane.

Chapman and Burkhalter followed the defendant from the arrival area to the boarding station for a connecting flight to Detroit, Michigan. Agent Chapman noted that Tolbert turned and looked at him on "one or two occasions" as she proceeded through the airport. Agent Chapman positioned himself next to the ticket agent for the Detroit flight and observed Tolbert check in. Through this observation, Chapman ascertained that the defendant had one piece of checked luggage, had purchased her ticket in cash and that her airline ticket was handwritten. He also learned that the defendant was traveling under the name L. Jones. The airline computer disclosed that Tolbert had purchased her ticket approximately 20 minutes prior to departure from Miami.

At this point, Chapman and Burkhalter approached Tolbert, Chapman presented his credentials and requested to see Tolbert's airline ticket and identification. Tolbert complied, handing Chapman a ticket folio containing a round-trip ticket from Miami to Detroit and one baggage claim check to Detroit numbered 387–945. She stated,

however, that her identification was in her checked luggage.

Tolbert told Chapman that she had purchased her ticket several days prior when, in fact, Chapman was aware that she had purchased the ticket only 20 minutes before flight departure. Chapman again identified himself as a narcotics agent, stated that he was attempting to determine if she was transporting drugs, and requested her consent to search her purse and luggage.

Tolbert became increasingly nervous but refused Chapman's request to search her pocketbook and suitcase. The conversation terminated and Tolbert boarded her flight to Detroit.

In Detroit, DEA Special Agent Bruce Bryda (Bryda) and other agents, alerted by Agent Chapman, awaited Tolbert's arrival and placed her under surveillance as she proceeded through the Detroit airport. The agents noted that Tolbert continuously scanned the airport in an apprehensive manner as if to determine if she was being monitored.

Tolbert passed through the baggage claim area without claiming her luggage and proceeded outside. She rapidly approached a taxicab.

Agents Bryda and Anderson approached Tolbert as she was entering the taxi, identified themselves and requested to examine her ticket and her identification. She presented her ticket folio to the agents and advised them that she had no identification on her person.

Agent Bryda noted that the baggage claim check number 387–945, previously observed by Agent Chapman in Atlanta, was no longer attached to the ticket folio. Agent Bryda advised Tolbert that they believed she was transporting narcotics and requested her to return to the terminal for further interrogation. Tolbert consented.

In response to Agent Bryda's inquiry, defendant denied having any luggage. The

(6th Cir. 1978); *United States v. Pope,* 561 F.2d 663 (6th Cir.1977); *United States v. Lewis,* 556 F.2d 385 (6th Cir.1977); *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 754 (1978); *Unit-*

*ed States v. Craemer,* 555 F.2d 594 (6th Cir. 1977); *United States v. McCaleb,* 552 F.2d 717 (6th Cir.1977).

agents however determined that one piece of luggage from the Atlanta flight bearing claim number 387–945 remained unclaimed. The agents conveyed the bag to the airport DEA office.

In the DEA office, Tolbert consented to a search of her purse but again denied ownership of the luggage. The subsequent search of defendant's purse disclosed a number of keys, one of which Bryda used to open the suitcase wherein approximately 280 grams of cocaine was discovered. Tolbert was then placed under arrest and advised of her rights.

On defendant's motion, the district court suppressed the evidence discovered in the suitcase. The lower court concluded that the search of the luggage without a warrant and in the absence of exigent circumstances violated the defendant's Fourth Amendment rights. The lower court rejected the government's contention that Tolbert had abandoned the luggage at the time of the search. The government instituted this appeal.[3]

It should be emphasized that the term "abandonment," as employed herein, does not refer to traditional concepts of property law. The concept of abandonment considered in the present context is a Fourth Amendment issue and the "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). Thus, the crucial inquiry is "whether governmental officials violated any legitimate expectation of privacy held by the [defendant]" *Rawlings v. Kentucky,* 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980).

The Supreme Court has noted that the concept of a "legitimate expectation of privacy" incorporates two elements:

The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy," [*Katz v. United States*] 389 U.S. [347] at 361, [88 S.Ct. 507 at 516, 19 L.Ed.2d 576 (1967)] whether, in the words of the Katz majority, the individual has shown that "he seeks to preserve [something] as private." *Id.,* at 351 [88 S.Ct., at 511]. The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,'" *id.* at 361 [88 S.Ct., at 516]— whether, in the words of the Katz majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances. *Id.,* at 353 [88 S.Ct., at 512], See *Rakas v. Illinois,* 439 U.S., at 143–144 n. 12 [99 S.Ct., at 430–431 n. 12], *id.,* at 151 [99 S.Ct., at 434], (concurring opinion); *United States v. White,* 401 U.S. [745] at 752 [91 S.Ct. 1122 at 1126, 28 L.Ed.2d 453 (1971)] (plurality opinion).

*Smith v. Maryland,* 442 U.S. 735, 741–42, 99 S.Ct. 2577, 2580–2581, 61 L.Ed.2d 220 (1978). *See United States v. Bailey,* 628 F.2d 938, 941 (6th Cir.1980).

Applying these principles to the facts of the case at bar, the Court is constrained to conclude that Tolbert possessed no reasonable expectation of privacy in the suitcase at the time of the search. When Tolbert was approached by the agents, she was entering a taxicab apparently intent on departing the airport without her luggage. This fact alone would not support a finding that she maintained no subjective belief that her bag was secure from government intrusion. An individual may depart from an airport without claiming her luggage for a variety of reasons, with full and legitimate intent to return and claim the baggage.

In the instant case however, Tolbert insisted that she was traveling without lug-

---

**3.** It should be noted that no brief has been filed nor was an appearance made at oral argument on behalf of the defendant. Prior to argument this Court contacted Tolbert and she maintained that she was unable to locate her attorney and had been unsuccessful in obtaining substitute representation. Because Tolbert has not indicated that she is indigent which would enable this Court to appoint counsel and because this Court cannot countenance indefinite delay, the matter was considered as submitted and scheduled on this Court's calendar.

gage and specifically disclaimed ownership of the bag in issue.[4] Tolbert can hardly assert that she "exhibited an actual (subjective) expectation of privacy" respecting the luggage when she specifically disclaimed ownership thereof. As the First Circuit Court of Appeals stated: "One who disclaims any interest in luggage thereby disclaims any concern about whether or not the contents of the luggage remain private." *United States v. Miller,* 589 F.2d 1117, 1131 (1st Cir.1978). This conclusion is consistent with decisions by other Circuits addressing the issue. *See, e.g., United States v. Kendall,* 655 F.2d 199 (9th Cir. 1981), *cert. denied,* 455 U.S. 941, 102 S.Ct. 1434, 71 L.Ed.2d 652 (1982); *United States v. Berd,* 634 F.2d 979 (5th Cir.1981); *United States v. Canady,* 615 F.2d 694 (5th Cir. 1980), *cert. denied,* 449 U.S. 862, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980); *United States v. Colbert,* 474 F.2d 174 (5th Cir.1973) (en banc); *cf. United States v. Washington,* 677 F.2d 394, 396 (4th Cir.1982) (although stating that it was not an abandonment case, the court concluded that where a defendant specifically denied ownership of a suitcase, agents "could justifiably rely on her statements to think they would not violate her rights by opening the bag.")

In sum, because, by her actions and vigorous oral disclaimers, Tolbert affirmatively indicated that she had no interest in preserving the secrecy of the contents of the suitcase, she had no legitimate expectation of privacy therein. Accordingly, Tolbert's Fourth Amendment rights were not violated by the search of the suitcase.

The trial court, by rejecting the government's abandonment theory, foreclosed consideration of the conduct of the law enforcement agents prior to the defendant's disclaimer of the luggage. This Court's reversal of the lower court on the issue of abandonment mandates a review of that conduct since an unconstitutional seizure or arrest which prompts a disclaimer of property vitiates that act. *See e.g. United States v. Morin,* 665 F.2d 765 (5th Cir. 1982). Normally, an appellate court will not address issues not passed upon by the lower court. However, the circumstances presented herein, that is, the lower court's entry of exhaustive findings of fact addressing the conduct of the law enforcement agents prior to defendant's disclaimer of her luggage, a comprehensive briefing of that issue by the parties below and the demand for a timely disposition of all issues presented, prompt this Court to resolve this question. *Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

Confronting the Court initially is assessment of the constitutional implications, if any, of the encounter of the defendant by the agents in Atlanta. Briefly stated, the question posed is: did that encounter constitute a "seizure" within the province of the Fourth Amendment. In *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct.

---

4. The district court relied on *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), for the proposition that a defendant cannot be said to have abandoned an interest in property in the face of potential criminal liability. In *Walter,* the defendants shipped certain obscene films by private carrier. The films were misdelivered to a third party who turned them over to the F.B.I. After holding the films for approximately 2 months the films were screened by the F.B.I. The Supreme Court found the actions of the F.B.I. in viewing the films without a warrant to be unconstitutional. In a footnote the Court commented:

Nor can petitioners' failure to make a more prompt claim to the Government for return of the films be fairly regarded as an abandonment of their interest in preserving the privacy of the shipment. As subsequent events have demonstrated, such a request could rea-

sonably be expected to precipitate criminal proceedings. We cannot equate an unwillingness to invite a criminal prosecution with a voluntary abandonment of any interest in the contents of the cartons. In any event, the record in this case does indicate that the defendants made a number of attempts to locate the films before they were examined by the FBI agents.

*Id.* at 658, 100 S.Ct. at 2402, n. 11.

As the government properly observes, *Walter* is not an abandonment case. One whose belongings are accidentally misdelivered cannot be said to have surrendered his desire to maintain the privacy of the items. To the extent the above-quoted language can be construed to indicate that an abandonment in the face of potential criminal prosecution is not to be given effect, such language is clearly dicta and this Court does not afford it controlling status.

1870, 1877, 64 L.Ed.2d 497 (1980), Justice Stewart wrote:

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

(citations and footnote omitted). The foregoing pronouncement by Justice Stewart was joined only by Justice Rehnquist. The Sixth Circuit, however, has recently accepted this standard as controlling. *United States v. Moore,* 675 F.2d 802 (6th Cir.1982); *United States v. Jefferson,* 650 F.2d 854 (6th Cir.1981).

In *United States v. Jefferson,* a DEA agent approached the defendant in the Detroit airport, identified himself and requested the defendant to accompany the agent to the baggage claim office. The Court held that a seizure had occurred within the purview of the Fourth Amendment, stating:

> In this case, agent Markonni did not merely stop Jefferson to ask him a few questions; he stopped him and immediately after identifying himself as a DEA agent requested Jefferson to accompany him to the baggage claims office. In these circumstances, Jefferson could not reasonably believe that he was free to leave. This was a "seizure" within the meaning of the Fourth Amendment.

650 F.2d at 856 (footnote omitted).

In *United States v. Moore,* DEA agents, again at the Detroit Airport, approached the defendant, inquired if they could ask a few questions and received an affirmative response. This Court held that the "apparently non-threatening approach, 'Can I ask you a few questions?'" 675 F.2d at 808, served to distinguish that case from the immediate request to accompany the agent in *United States v. Jefferson.* Accordingly, the Court concluded that the initial contact was not a seizure.

■ In the instant case, as indicated, Agent Chapman merely approached the defendant, identified himself and requested to examine her ticket and identification. While this approach was perhaps less "non-threatening" than that in *United States v. Moore,* it certainly did not rise to the level of authority displayed in *United States v. Jefferson.* Moreover, the facts reveal that Tolbert felt sufficiently free to refuse Chapman's request to search her belongings and, this refusal having concluded the conversation, Tolbert proceeded unimpeded on her way. Viewing the situation in its entirety, the Court is compelled to find that the brief encounter at the Atlanta airport was not a seizure for Fourth Amendment purposes.

■ Conversely, the Court holds that the encounter at the Detroit airport constituted a seizure. The facts disclose that the agents approached defendant as she was attempting to enter a taxi, again requested her ticket and identification, informed her that they suspected she was a narcotics courier and, as in *United States v. Jefferson,* almost immediately asked her to accompany them. Under the foregoing circumstances a reasonable person would not have felt free to ignore the agents and depart.

■ A brief investigatory detention, as initially occurred at the Detroit airport in this case,[5] is permissible if "supported by a reasonable and articulable suspicion that the person seized is engaged in criminal

---

5. Asking defendant for her identification and to accompany the agents did not transform the seizure into a full scale arrest. *See, e.g., United States v. Smith, supra,* at 886 n. 15.

activity." *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). *See also, Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Supreme Court has recently observed:

Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). The Supreme Court proceeded, in *Cortez,* to establish a two-pronged approach for assessing the legality of a stop:

First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

*Id.*

The first element of this approach is satisfied in that Tolbert fit certain characteristics of the DEA's drug courier profile. The drug courier profile is "an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs." *United States v. Mendenhall, supra,* 446 U.S. at 547, 100 S.Ct. at 1873 n. 1. Tolbert fit the following profile characteristics: (1) she was traveling from a "source city," Miami; (2) she had only one piece of checked luggage; (3) she had paid for her ticket in cash and; (4) she had purchased her ticket only 20 minutes before departure from Miami.

Satisfying the drug courier profile does not, standing alone, justify a seizure. *Reid v. Georgia, supra.* However, the profile does represent a "pattern[ ] of operation of certain kinds of lawbreakers" from which "a trained officer draws inferences and makes deductions." *United States v. Cortez, supra,* 449 U.S. at 418, 101 S.Ct. at 695.

With respect to the second element of the *Cortez* test, the following facts specifically relating to Tolbert are pertinent: (1) she appeared to suspect the agent in Atlanta was a law enforcement authority and became nervous; (2) her apprehensiveness was agitated when she was questioned about narcotics; (3) she misrepresented the purchase date of her ticket, *see United States v. Moore, supra,* at 808; (4) in both the Atlanta and Detroit airports, she continuously attempted to determine if she was under surveillance and; (5) she was departing the airport without her luggage. All of these facts, taken together, raise a suspicion with respect to the "particular individual" —Tolbert.[6] Accordingly, the Court concludes that the second prong of the *Cortez* test was also satisfied, and therefore the stop at the Detroit airport was constitutionally permissible.

---

**6.** *See generally, United States v. Nembhard, supra.*

Tolbert's disclaimers of ownership of the luggage were thus not precipitated by improper conduct on the part of law enforcement agents. Accordingly, the subsequent search of the suitcase, as indicated by the Court's abandonment analysis *supra,* did not offend the Fourth Amendment. The judgment of the lower court is therefore reversed and this matter remanded for further proceedings.