870 F.2d 658
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Conrado L. GONZALEZ, Defendant-Appellant.
 No. 87-1687.
 United States Court of Appeals, Sixth Circuit.
 March 13, 1989.
 
 Before KENNEDY and DAVID A. NELSON, Circuit Judges, and BAILEY BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant Conrado Gonzalez was tried and convicted in federal court on a charge of possession of a firearm by a convicted felon. On the basis of an evidentiary hearing conducted prior to trial, the district court held that Mr. Gonzalez lacked standing to challenge the seizure of the weapon. The issue on appeal is whether Mr. Gonzalez sustained his burden of showing that he had a legitimate expectation of privacy in the apartment where the weapon was discovered. Agreeing with the district court that Mr. Gonzalez failed to sustain that burden, we shall affirm the conviction.
 
 
 2
 * At 5:30 a.m. on May 3, 1986, a Saturday, police were dispatched to an apartment at 627 Sadie Court in Lansing, Michigan, in response to a report of a domestic disturbance. When Police Officer Edward Forrest knocked on the door of the apartment, the door was opened by defendant Gonzalez. Officer Forrest, who subsequently testified that he saw the handle of a gun protruding from the inside pocket of the man's jacket, told Mr. Gonzalez he wanted to see the lady of the place to make sure she was all right. Mr. Gonzalez thereupon walked back into the apartment and summoned Krista Sue Humble to the door.
 
 
 3
 In the course of the ensuing conversation, Ms. Humble made it clear that she found the continued presence of Mr. Gonzalez unwelcome. The police asked him for identification, and he went into a back bedroom to get it. Ms. Humble then said it would be "OK" for Officer Forrest and the officers who were with him to enter the apartment, according to Officer Forrest's subsequent testimony, and Officer Forrest headed for the bedroom.
 
 
 4
 The officer testified at trial that he saw Mr. Gonzalez remove the handgun from his inside jacket pocket and put it under the covers of the bed. Mr. Gonzalez testified at trial that he never had the gun on his person. It is undisputed that the officer found a handgun hidden in the bedroom.
 
 
 5
 Mr. Gonzalez was eventually indicted for possession of a firearm by a convicted felon. The court held a pretrial hearing on a "motion to produce evidence" filed by the defendant. There was no formal motion to suppress evidence, but during the hearing it became apparent that the defendant wanted the handgun suppressed. Defense counsel was given permission to put Mr. Gonzalez and Ms. Humble on the stand in an effort to establish that Gonzalez had standing to seek suppression.
 
 
 6
 Mr. Gonzalez testified that he lived at 6072 Hart, in the municipality of East Lansing. He was not at home on May 3, 1986, having gone to the residence of Krista Sue Humble in Lansing. He did not know her address. Asked if it were not true that he had "been more or less living with her off and on for a couple of years," Mr. Gonzalez responded "Yeah, I spend some nights at her house. Sometimes she spends the night at my house." In response to a further question, Mr. Gonzalez testified that Ms. Humble was currently pregnant.
 
 
 7
 On the night of the handgun incident, Mr. Gonzalez testified, he and Ms. Humble had gone to her place and had become involved in an argument. The noise apparently prompted some of the neighbors to call the Lansing police. When asked by his lawyer if the police requested permission to enter the premises, Mr. Gonzalez responded as follows:
 
 
 8
 "I am not--no, I guess not. I asked them to wait. I told them the problem was over. And they said they had to see her to make sure everything was all right. I asked them to wait, and went back and called her."
 
 
 9
 After Ms. Humble got to the door, Mr. Gonzalez testified, the police asked him for his I.D. He went back to the bedroom to get it, and when he started to return to the living room a police officer entered the bedroom, asked what he had in his hand, searched him, and permitted him to return to the living room. A couple of minutes later the policeman came out of the bedroom with a handgun.
 
 
 10
 On cross-examination, Mr. Gonzalez testified that although Ms. Humble had asked him to leave the apartment, they "had already come to an understanding" by the time the police arrived. The arrival of the police "kind of brought the argument back up," Mr. Gonzalez said, and she then asked him to leave.
 
 
 11
 Ms. Humble took the stand at the conclusion of Mr. Gonzalez's testimony and was asked if Mr. Gonzalez had "said essentially what happened on that evening." She responded "Yeah. It was just like he said." Ms. Humble confirmed that over the past year and a half to two years Mr. Gonzalez had sometimes slept at her apartment and she had sometimes slept at his. They were "never apart," she testified, and were "pretty much" living together, at his place or hers, full-time.
 
 
 12
 On cross-examination Ms. Humble testified that she had asked Mr. Gonzalez to leave after the officers got to her apartment; that she had been drinking quite heavily that night; and that she had previously said that some things about the evening were "hazy" in her mind. When asked if she had previously said to an investigator that she did not remember telling the police they could not enter, she responded thus:
 
 
 13
 "He had asked me in a way where there was no reason for them to ask for entrance, so I couldn't deny them entrance. Okay, because the circumstances didn't arise where they should ask me for entrance into the apartment. And the way he had asked the question, he was asking more or less if I denied them after they'd asked me."
 
 
 14
 Ms. Humble went on to say that she had a lease, and that she was the only person on the lease.
 
 
 15
 At the conclusion of the hearing, the district court ruled from the bench that under United States v. Adamo, 742 F.2d 927, 947 (6th Cir.1984), cert. denied, 469 U.S. 1193 (1985), and United States v. Buckner, 717 F.2d 297 (6th Cir.1983), a guest had no standing to raise a Fourth Amendment objection to the warrantless search of his host's premises. "In the usual case," said the district court, quoting from Buckner at page 299, "the defendant will not have had a legitimate expectation of privacy in the premises which were searched and therefore will be unable to challenge the search." In the case at bar, the district court went on to say,
 
 
 16
 "There's nothing to indicate that [Ms. Humble] challenged the police entrance.
 
 
 17
 The testimony of the defendant is that while in the bedroom, the officers came in, searched the place, went into the bedroom, came out with a handgun."
 
 
 18
 After a few additional comments on the evidence, the district court found that Mr. Gonzalez "had no standing to challenge the entrance and search by the police in this case."
 
 
 19
 The trial began the next day. (Insofar as the trial testimony of Mr. Gonzalez and Ms. Humble was relevant to the standing issue, it was generally consistent with the testimony, summarized above, that they gave at the pretrial hearing.) The jury found Mr. Gonzalez guilty, and he was sentenced to two years in prison. This appeal followed, Mr. Gonzalez contending that the record as a whole shows that he had standing to challenge the search of Ms. Humble's bedroom and the seizure of the handgun there.
 
 II
 
 20
 A defendant may challenge a police search under the Fourth Amendment only if he has a "legitimate expectation of privacy" in the place searched. In deciding whether a defendant has such an expectation, a court must consider both the defendant's subjective expectation and the objective reasonableness of that expectation. See Rakas v. Illinois, 439 U.S. 128, 143 n. 12 (1978); United States v. Tolbert, 692 F.2d 1041, 1044 (6th Cir.1982), cert. denied, 464 U.S. 933 (1983).
 
 
 21
 We recently applied the "legitimate expectation of privacy" standard in United States v. Sangineto-Miranda, 859 F.2d 1501 (6th Cir.1988). One of the defendants in that case was "a casual visitor" who had never lived in the apartment and did not have a key. He was sleeping on a couch in the apartment when the police arrived, and although he testified that he intended to sleep in the apartment that night, we held that those facts alone did not give him a legitimate expectation of privacy. Id. at 1510. Another defendant, while not the apartment's lessee, had held a key to the apartment "for about a year," had been "afforded unrestricted access 'just as any part of [the lessee's] family,' " had been "allowed to stay overnight '[a]s often as he felt,' even without the lessee's knowledge or consent," had stored clothes and personal effects in the apartment, and had manifested his subjective expectation of privacy and his right to exclude others by locking the outside door of the apartment behind him when he entered the apartment on the night the police came to search it. These facts, the court held, made clear that this defendant did enjoy a legitimate expectation of privacy in the apartment. Id.
 
 
 22
 The party aggrieved by a search, as the district court observed in the present case, bears the burden of showing that he has standing to challenge the search. United States v. Smith, 783 F.2d 648, 650 (6th Cir.1986). We cannot say that the district court erred in finding that Mr. Gonzalez failed to sustain his burden here. Mr. Gonzalez did not pay the rent on Ms. Humble's apartment, as far as the record shows. He did not even know the address of the place. There was no showing of how many times he had spent the night there. There was no showing that he had a key to the apartment, or that Ms. Humble gave him the run of the place in her absence. There was no showing that he kept clothing or other personal effects there, or that he received mail or phone calls at the apartment, or that he was allowed to entertain guests in the apartment. He apparently acknowledged Ms. Humble's right to order him to leave. There was no showing that on the night in question Ms. Humble wanted the police to get out, as opposed to wanting Mr. Gonzalez to get out. On the contrary, the most reasonable interpretation of the testimony is that the arrival of the police caused the argument between Mr. Gonzalez and Ms. Humble to flare up again as the couple stood in the doorway, at which point Ms. Humble asked him to leave and the police asked him for his identification. The mere fact the Mr. Gonzalez and Ms. Humble happened to have been engaged in peripatetic cohabitation for some time does not, we believe, compel the conclusion that Mr. Gonzalez had a legitimate expectation of privacy in any bedroom that may have been the scene of the couple's past intimacies, regardless of whether his presence there had become distasteful to her whose bedroom it was.
 
 
 23
 The judgment of conviction is AFFIRMED.