UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard S. OSWALD,
Defendant-Appellant.

No. 85–5530.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 6, 1986.

Decided Feb. 18, 1986.

William R. Tunkey, Weiner, Robbins, Tunkey & Ross, Miami, Fla., Peter Raben, argued, for defendant-appellant.

John W. Gill, U.S. Atty., James R. Dedrick argued, Asst. U.S. Atty., Knoxville, Tenn., for plaintiff-appellee.

Before MERRITT, JONES and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

Before pleading guilty to a federal drug charge, defendant-appellant Oswald moved to suppress the principal evidence against him—some $300,000 worth of cocaine that a deputy sheriff found on opening a metal briefcase taken from the trunk of a burned-out automobile Oswald had left on the berm of an interstate highway. The trial court denied the motion to suppress, holding that a warrantless search of the suitcase did not violate Oswald's constitutional right to be secure in his effects against unreasonable searches and seizures; Oswald had abandoned the automobile and its contents, the court found, and therefore could not complain of the search. We do not think the trial court erred in finding an abandonment, and we therefore affirm the judgment of conviction.

## I

Oswald's odyssey began in Florida, where a friend gave him two kilograms of cocaine, an expensive metal briefcase, and a Pontiac Trans-Am automobile. Oswald locked the cocaine inside the briefcase, locked the briefcase in the trunk of the car, and started out for Michigan.

As Oswald was driving north on Interstate 75 in rural Tennessee, the car burst into flames. Oswald pulled off the highway, jumped out of the car (leaving the key in the ignition), and ran across the road to the median strip. The briefcase remained in the trunk; Oswald would have liked to retrieve it, but he was afraid the car was about to explode, and he preferred not to be in the immediate vicinity if that happened.

As luck would have it, a convicted felon named Frye happened to be driving by when the mishap occurred. Frye stopped his car, ran to the median strip, and asked Oswald if he could help. Oswald's response was "Let it go. Let it burn. Leave it alone." Oswald then asked to be taken to a telephone, and within 60 seconds other motorists saw the two men drive off in Frye's car.

Asked at the suppression hearing why he had not simply waited in the median until the authorities arrived to put out the fire, Oswald gave the obvious answer: "Because I didn't want to be arrested for cocaine."

Frye must be the sort of person who inspires confidence, judging by the disclosures Oswald made to him on the way to the telephone. After nervously remarking "I'm dead; I'm dead," Oswald told Frye the police were after him and went on to explain "[t]here's $300,000 worth of cocaine in the car."

When they reached a service station that had a telephone, Oswald went in to call his friend in Florida to tell him his car was on fire. Oswald returned from this call to tell Frye the car was going to be reported stolen. (Such a report was, in fact, made in Florida the following week.) Neither man found it expedient to call the local authorities about the burning automobile, or to mention the fire to the gas station attendant.

The call to Florida having been taken care of, Oswald handed Frye three $100 bills [1] and asked to be driven to a motel. Frye checked Oswald in at a Ramada Inn, taking it upon himself to give Oswald a false name. [2]

In the meantime, Sergeant Larry Proaps, of the Loudon County, Tennessee, Sheriff's Office, had arrived at the burning car. He found the Rescue Squad already there, trying to extinguish the flames, and he asked a bystander about the whereabouts of the driver. On learning that the driver had left the scene in another car, Sgt. Proaps sent people to check at the nearest interstate exists for anyone who might have called for emergency help. He also monitored his police radio to see if a fire had been reported. None had been. Neither did Oswald return to the scene while Proaps was there—a fact that the officer might not have found too surprising had he known then what he learned later about the vehicle's contents.

Examining the badly burned car after the flames had finally been extinguished, Sgt. Proaps found the metal suitcase and

---

1. Frye's original offer of help may have been purely altruistic, but virtue, in this case, was not solely its own reward. By the time the men parted two days later, Frye had received further funds from Oswald—"just about every single penny that he had"—and various items of jewelry. They had also engaged in discussions about a payment of $5,000 or $10,000 to Frye for either getting the briefcase back or for getting Oswald to Florida. All in all, bearing in mind the laws on misprision of felony, we think Oswald's counsel may have indulged in a touch of hyperbole when, in one of his briefs, he referred to Frye as a "good" Samaritan.

2. Frye's *modus operandi* calls to mind that of Stanley Featherstonehaugh Ukridge, the protagonist of *He Rather Enjoyed It*, by P.G. Wodehouse:

   " 'Fortunately, I had given him a false name—'
   'Why?'
   'Just an ordinary business precaution,' explained Ukridge."

several other portable items. In accordance with normal policy, he transferred them to the trunk of his patrol car for safekeeping. He also took the ignition key. The key had been fused to the steering column by the heat of the fire, and he took the steering column too, it having come loose from its moorings. What was left of the car was towed away, and Sergeant Proaps drove off to respond to an unrelated law enforcement call about 45 minutes to an hour after he had arrived.

Once his other business had been completed, and after more than one and a half hours had elapsed since his departure from the scene of the fire, Sergeant Proaps started going through the items he had placed in his patrol car. (He was not unmindful, as he did so, of the curious fact that no one had ever returned to identify the burned-out car with the Florida license plates.) First the officer searched a bag of clothing. Finding no identification there, he opened a wooden case that proved to contain, among other things, a voter registration card with Oswald's name and Florida address. Then the officer pried open the metal briefcase. The nature of the contents cleared up the mystery of why no one had come to claim them.

That evening, after Samaritan Frye had left Oswald's motel to get some supper, Frye returned to the motel and picked up Oswald for a bit of cautious reconnoitering. The men wanted to find out if the car had been completely burned and to see if the metal briefcase could be retrieved. They went first to the scene of the fire, but found nothing there, the car having been towed away earlier. The next day they went to th elot to which the car had been towed, and they found that the car had been placed behind a locked fence. Oswald made no direct attempt to claim his property, but he did have Frye telephone the sheriff's office and pretend to be an insurance agent who wanted to check on the whereabouts of the car. The sheriff's office asked Frye for the telephone number from which he was calling. Frye promptly hung up, realizing that the cocaine must have been discovered. He so advised Oswald: "the goose," as Frye told Oswald, "is up."

Oswald then left town.

## II

In the fullness of time Oswald was indicted for possession with intent to distribute 4.4 pounds of cocaine. Prior to trial he moved to suppress the evidence taken from the car and luggage. After conducting an evidentiary hearing the trial court denied the motion to suppress. Oswald then entered a conditional plea of guilty, pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, reserving the right, on appeal from the judgment, to review of the adverse determination of his motion to suppress. If Oswald prevails on this appeal he will be allowed to withdraw his guilty plea.

In support of the finding that Oswald had abandoned the car and its contents before the briefcase had been searched, the trial court pointed out that:

"He made no effort to put out the fire, he made no effort to solicit any aid to put out the fire. He showed absolutely no interest in rescuing the cocaine in the trunk of his car. He wanted to put as much distance as he could between him and the cocaine. He wanted to divorce himself completely from this situation.

"He showed an obvious intent to abandon the car, the container and the cocaine."

The situation, the trial court concluded, was similar to that "where someone abandons a suitcase of contraband in an airport, when faced with an immediate risk of being caught, completely disassociating one's self from the contraband." The court did not reach the question whether Sergeant Proaps had conducted a valid "inventory search," nor did the court decide—the government not having raised the point—whether a warrantless search could be justified on the basis of exigent circumstances.

## III

The question of abandonment, *vel non,* is, as we perceive it, a mixed question

of law and fact. The trial court's resolution of such a question is entitled to great deference as far as its factual aspect is concerned. *United States v. Brown*, 557 F.2d 541, 547 (6th Cir.1977). To the extent that the trial court's finding of abandonment in this case represents a factual determination, it is not clearly erroneous. To the extent it represents a legal determination, we think it is pretty clearly correct.

In *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), a Russian spy had apparently discarded a hollowed-out pencil containing microfilms and a hollowed-out block of wood containing a code book, leaving these articles behind in a wastebasket when he vacated a hotel room. The FBI seized the materials without benefit of a warrant, and the incriminating evidence was used in the trial that followed. In affirming Abel's conviction, the United States Supreme Court, speaking through Mr. Justice Frankfurter, said:

> "So far as the record shows, petitioner had abandoned these articles. He had thrown them away. So far as he was concerned, they were *bona vacantia*. There can be nothing unlawful in the Government's appropriation of such abandoned property." 362 U.S. at 241, 80 S.Ct. at 698.

■ Whether property has been "abandoned," in this sense, does not depend on where legal title rests, or whether one asserting a Fourth Amendment right has a legally enforceable possessory interest in the property; the question, rather, is whether the person claiming the protection of the Fourth Amendment "has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978).

In this connection, as the trial court said in the case at bar, the "checked luggage" cases are instructive. One such case is *United States v. Sanders*, 719 F.2d 882 (6th Cir.1983), where a suitcase containing cocaine and marijuana had been checked through on the ticket of an airline passenger flying north from Florida. Believing that she was under surveillance, the passenger left the airport at her destination without retrieving her suitcase from the baggage claim area. When questioned by law enforcement officials, she said that she had not claimed the suitcase because she was not going straight home. She refused to consent to a search of the suitcase, thus actively indicating an interest in keeping the contents private. Under these circumstances, this court held that there had been no abandonment.

The other side of this coin is represented by *United States v. Tolbert*, 692 F.2d 1041 (6th Cir.1982), where the actions of another airline passenger who had checked a cocaine-laden suitcase on a flight from Florida were held to have manifested no expectation of privacy. The defendant in *Tolbert* not only passed through the baggage claim area without picking up her luggage, but, when questioned by the authorities, she denied having any luggage. Concluding that Tolbert had not exhibited the necessary expectation of privacy in the suitcase, this court held it was error to suppress the evidence discovered in a warrantless search of the suitcase. The suitcase having been abandoned, Tolbert's Fourth Amendment rights were not violated by the search.

■ A suitcase or briefcase is property of a kind in which the owner or bailee normally has a strong expectation of privacy, but *Tolbert* shows that such an expectation can be given up. The trial court's conclusion in the case at bar that Oswald gave up his expectation of privacy in his Florida friend's metal briefcase seems fully consistent with our conclusion in *Tolbert;* Oswald's flight from the scene of the burning automobile, without any visible effort to retrieve the car in a reasonable time or see to the safety of its contents, strikes us as the functional equivalent of Miss Tolbert's denial that she had any luggage in the airport.

Not only will privacy expectations vary with the type of property involved, *United States v. Metzger*, 778 F.2d 1195, 1200 (6th Cir.1985), but they will vary with the loca-

tion of the property. When one leaves a suitcase in an airport baggage claim area, he leaves it in a place where there is normally some measure of security. It is reasonable to expect that checked luggage will be locked up, if not claimed within a reasonable time, and will be kept safe until the person holding the claim check comes to retrieve it. One who choses to leave luggage in an unlocked burned-out automobile at the side of a highway in the country can fairly be thought to have a much lower expectation of privacy—and Oswald's expectation, as we know, was very low indeed. Flaming cars do tend to attract a certain amount of attention. The flames may keep people at a respectful distance for a time, but fires eventually die out; and a fire-ravaged automobile, left unprotected in the open countryside, invites just the kind of examination Oswald feared his would receive.

From the vantage point of Officer Proaps, the indicia of abandonment seem reasonably strong. The fact that the driver of the Florida car had departed the scene very quickly would not of itself indicate abandonment if he had left to call the fire department, but Sgt. Proaps knew that no such call was made. Sgt. Proaps knew that the Florida driver had not left his name with any of the motorists who had seen him go off with Frye. Sgt. Proaps knew that the Florida driver had not left any message at either of the nearest exists on the interstate highway. And Sgt. Proaps knew that the Florida driver had not returned to the scene of the fire within the span of time in which a person having a legitimate expectation of privacy in the car's contents could reasonably have been expected to show up.

It is true that in *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980), which was not an abandonment case, the plurality opinion notes by way of dictum that a supposed failure to make a prompt claim for the return of *misdelivered* contraband would not have constituted an abandonment of the owner's privacy interests: "[w]e cannot equate an unwillingness to invite a criminal prosecu-

tion with a voluntary abandonment...." 447 U.S. at 658, n. 11, 100 S.Ct. at 2402, n. 11. Surely, however, a guilty conscience cannot create an expectation of privacy that would not otherwise exist. Where an ordinary person could fairly be said to have abandoned his privacy interests by failing to come forward, a reasonable expectation of privacy cannot be thought to have been retained solely by virtue of the fact that the person happens to be guilty of a crime. We think Officer Proaps was entitled to conclude, under the particular circumstances of this case, that a person retaining an expectation of privacy in the contents of the metal briefcase would have come forward within the first two or three hours after the fire. Other courts have not infrequently attached significance, as we do here, to the claimant's failure to come forward when he might have been expected to. See Annot., 40 A.L.R. 4th 381 (1985).

That Oswald may have entertained a feeble hope of regaining possession of the cocaine is hardly enough to vitiate the finding of abandonment. See *United States v. Williams*, 569 F.2d 823 (5th Cir.1978), where the driver of a marijuana-laden tractor trailer rig left his trailer in a parking lot, knowing he was under surveillance, and returned four hours later to see if the coast was clear. The court found that the driver's "only conceivable purpose in leaving the trailer unguarded and unlocked in the parking area was to rid himself of the vehicle with its incriminating contents." Likening the driver's conduct to that of the bank robber who, finding himself pursued, throws away his gun in a place where he thinks he might ultimately retrieve it if it is not picked up, the court said such conduct "is transparently an abandonment of the tight grip of ownership;" the abandonment is not negated by "the feeble hope of re-acquisition." 569 F.2d at 826. See also *United States v. Kendall*, 655 F.2d 199 (9th Cir.1980), where post-abandonment attempts to reclaim a suitcase containing cocaine did not entitle the defendants to prevail on their motions to suppress.

The *Kendall* court used an objective standard in determining whether there was an intent to abandon, and Oswald argues that such a standard should be used here. Thus far in our analysis we have concentrated mainly on the objective evidence known to Sgt. Proaps at the time he opened the metal briefcase. If, under this kind of objective standard, the briefcase could properly be found to have been abandoned by the time it was opened, we fail to see how Oswald's subsequent conduct (returning at night to the scene of the fire, observing the burned-out car in the place to which it had been towed, and having Frye call the sheriff's office in the guise of an insurance adjuster) could possibly have revoked the abandonment *nunc pro tunc,* even if Sgt. Proaps had known of such conduct, which he did not.

If we are entitled to examine all of Oswald's behavior before the briefcase was opened, including the behavior of which Officer Proaps could have had no knowledge, it simply confirms the conclusion that the briefcase had been abandoned. Oswald's conversations with Frye, the call to Florida, and the act of hiding out in a motel room under an assumed name hardly bespeak a reasonable expectation of privacy in the contents of the briefcase.

It remains to be considered whether the trial court was required to grant Oswald's motion to suppress because of the holdings in *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), and *Michigan v. Clifford,* 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984), two arson cases involving warrantless searches of fire-damaged real estate. Neither decision, in our judgment, can carry the day for Oswald.

In *Clifford* the owners of a fire-damaged private residence unequivocally manifested a continued expectation of privacy in their home by arranging to have a work crew board up the house after the fire. The crew was on the job when the authorities arrived to search, without a warrant, for evidence of arson. It was admitted that no exigent circumstances justified the search. Noting that "[p]rivacy expectations will vary with the type of property, the amount of fire damage, the prior and continued use of the premises, and in some cases the owner's efforts to secure it against intruders," and expressly declaring that "[t]he test essentially is an objective one," 104 S.Ct. at 646, Justice Powell, who announced the judgment of the Court, concluded that the Cliffords retained reasonable privacy interests in their damaged home. Justice Powell stressed "the strong expectations of privacy associated with a home," together with the fact that "the Cliffords had arranged to have the house secured against intrusion in their absence." 104 S.Ct. at 648.

Had Oswald arranged to have his car secured against intrusion in his absence, or had he remained in the median or returned there to tell Officer Proaps to leave the metal suitcase alone, there would have been objective evidence that Oswald intended to retain his privacy interests in the suitcase. If we assume that such a continued expectation of privacy would have been reasonable, *Clifford* and *United States v. Sanders,* 719 F.2d 882 (6th Cir.1983), *supra,* teach that there would have been no abandonment. The objective evidence points the other way here, however, and *Clifford* provides cold comfort for Oswald.

*Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, *supra* —a decision that *Clifford* was intended to "clarify," 104 S.Ct. at 645—provides more support for Oswald's argument, but not much more. Mr. Tyler operated a furniture store that he was suspected of having put to the torch. Almost four weeks after the fire a state official conducted a warrantless search of the premises for evidence of arson. The Supreme Court of Michigan held that the evidence so obtained was inadmissible, as the product of an illegal search and seizure, and the United States Supreme Court affirmed.

Mr. Justice Stewart, who delivered the opinion, does not tell us whether the gutted store had been secured against intruders. He does, however, quote with evident approval the following language from the Michigan court's opinion:

"[Once] the blaze [has been] extinguished and the firefighters have left the premises, a warrant is required to reenter and search the premises, *unless there is consent or the premises have been abandoned.*" 436 U.S. at 503, 98 S.Ct. at 1946, quoting 399 Mich., at 583, 250 N.W.2d, at 477. (Emphasis supplied.)

Mr. Tyler had not abandoned his furniture store in the way Oswald abandoned his car and briefcase. Unlike Oswald, Tyler did not cut and run; on the contrary, we know from the opinion of the Michigan Supreme Court that Tyler actually returned to the scene of the fire with a Michigan official more than two weeks before the date of the offending search. 250 N.W.2d at 470.

Oswald's flight having provided objective abandonment evidence of a kind that did not exist in *Michigan v. Tyler*, that case is not controlling here. We think the facts of the case at bar amply justify the conclusion reached by the trial court, and the judgment of that court is hereby AFFIRMED.