849 F.2d 1474
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Reginald Gary DAVIS, Defendant-Appellant.
 No. 87-1969.
 United States Court of Appeals, Sixth Circuit.
 June 24, 1988.
 
 Before CORNELIA G. KENNEDY and NATHANIEL R. JONES, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant, Reginald Davis, was convicted in the United States District Court for the Eastern District of Michigan, of conspiracy to possess with the intent to distribute cocaine, possession with the intent to distribute cocaine, and distribution of cocaine. Defendant now appeals his conviction, arguing that the search of his hotel room was invalid, that the government agents improperly interrogated him without giving him his Miranda rights, that the District Court impermissibly allowed testimony of prior criminal acts, that the conviction on the conspiracy and distribution counts were not supported by sufficient evidence, and that the written judgment should be modified because it was inconsistent with the oral sentence announced by the District Court. Because we believe that the District Court's judgment was proper, we AFFIRM.
 
 I.
 
 2
 In September 1986, Drug Enforcement Administration (DEA) agents were dispatched to Ann Arbor, Michigan to serve an arrest warrant on defendant, who was a fugitive. According to a tip they received, defendant was staying in room 613 of the Residence Inn. The agents were meeting at the nearby Sheraton Inn to plan the arrest when one of the agents spotted defendant using the pay phone in the Sheraton's lobby. The agents approached Davis, arrested him, and read him his Miranda rights. After agreeing to answer some questions, (testimony of Agent Moore, Joint Appendix at 112), the defendant identified himself as Reginald Johnson. On his person, the agents found identification papers in the name of Reginald Johnson and a hotel key for a room 613. Defendant repeatedly denied that he was staying in room 613 of the Residence Inn, first claiming that he was staying at the Sheraton, and then that he was staying at the Wolverine Inn. When asked if the agents could search room 613 of the Residence Inn, defendant replied that "you could go ahead and search the room, but its not mine."
 
 
 3
 After conferring with an Assistant United States Attorney, and requesting permission from the hotel management, the agents went to room 613 of the Residence Inn to search it. When they arrived, they found the door to the room open and two people inside. One person was a hotel maintenance employee while the other was defendant's girlfriend, Michaela McKinnie. The agents ordered the hotel employee to leave the room, and asked McKinnie if they could look around. McKinnie agreed to let them search the room.
 
 
 4
 The search of the room revealed a package containing approximately nine grams of cocaine inside a suitcase containing women's clothing. Approximately a kilogram of cocaine, wrapped in two separate packages, was found in a suitcase containing men's clothing. After making these discoveries, the agents arrested McKinnie and informed her of her Miranda rights.
 
 
 5
 At this point, allegedly for security reasons, agents brought defendant into the room from the car where they had been holding him. When he entered the room and saw the cocaine on the bed and his girlfriend under arrest, he stated "hey, that cocaine is mine, it's not hers." (Testimony of Agent Magee, Joint Appendix at 46) The agents eventually took defendant to the DEA office in Detroit, where, after being read his Miranda rights again, he gave a full confession.
 
 II.
 
 6
 Defendant first argues that the search of the motel room violated his fourth amendment rights. The District Court, after an evidentiary hearing on defendant's motion to suppress the evidence found in the search, held that when the defendant repeatedly told the agent that he was not staying in room 613, he effectively abandoned any reasonable expectation of privacy in the contents of that room. We agree. In Abel v. United States, 362 U.S. 217 (1960), the Supreme Court held that once property is abandoned, the owner relinquishes the right to have it free from search. "There can be nothing unlawful in the Government's appropriation of such abandoned property." Id. at 241.
 
 
 7
 The question here, then, is whether defendant's repeated denials that he was staying in the room are sufficient to support the District Court's findings of abandonment. Because the question of abandonment is a mixed question of law and fact, the trial court's resolution of the issue here is entitled to great deference as far as its factual aspect is concerned.[1] Also, the question of whether property has been abandoned does not depend on where legal title to the property rests, but rather on whether the person claiming the protection of the fourth amendment "has a legitimate expectation of privacy in the invaded place." United States v. Oswald, 783 F.2d 663, 666 (6th Cir.1986), quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978).
 
 
 8
 In Smith v. Maryland, 442 U.S. 735 (1979), the Supreme Court recognized that the legitimate expectation of privacy incorporates two elements:
 
 
 9
 The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy,"--whether, in the words of the Katz majority, the individual has shown that "he seeks to preserve [something] as private." The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as reasonable,"--whether, in the words of the Katz majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances.
 
 
 10
 Id. at 740 (citations omitted).
 
 
 11
 Applying these standards to this case, we agree with the District Court that defendant abandoned any privacy interest he had in the contents of his hotel room. Rather than seeking to preserve the items in the room as private, he disclaimed any interest in them at all. Defendant's disclaimer is similar to that in United States v. Tolbert, 692 F.2d 1041 (6th Cir.1982), cert. denied, 464 U.S. 933 (1983), where defendant denied that a piece of luggage was hers, in spite of the fact that the agents knew that the claim number on the luggage matched the number she was given when she checked the luggage upon boarding the plane. The Tolbert court held that she could "hardly assert that she 'exhibited an actual (subjective) expectation of privacy' respecting the luggage when she specifically disclaimed ownership thereof." Id. at 1045.
 
 
 12
 Defendant, however, argues that his disclaimer of an interest in the room did not constitute an abandonment because defendant was faced with the dilemma of either disclaiming any interest in the room, and separating himself from its incriminating contents, or acknowledging that it was his room, which made him responsible for its contents. Defendant cites Walter v. United States, 447 U.S. 649, 658, n. 11 (1980) (plurality opinion), where a plurality of the Supreme Court refused to "equate an unwillingness to invite a criminal prosecution with a voluntary abandonment of any interest" in the property. However, as this Court said in Oswald, the Walter case can be distinguished from abandonment cases. Oswald, 783 F.2d at 667; see also Tolbert, 692 F.2d at 1045 n. 4. In Walter the defendants shipped certain obscene films by private carrier. The films were misdelivered to a third party who turned them over to the FBI. The FBI subsequently viewed the films without a warrant, and the Supreme Court ordered the films suppressed. Unlike the case at bar, the defendants in Walter accidently misdelivered the films to a third party, which can hardly be termed an abandonment. This is especially true since there was evidence in that case that defendants made a number of attempts to locate the films before they were examined by the FBI. Thus we do not believe that Walter controls here.
 
 III.
 
 13
 The second issue on appeal is whether defendant was deprived of his fifth amendment right against self-incrimination when the agents brought him back into the hotel room, and be blurted out that all of the drugs were his, and not his girlfriend's. Defendant contends that by bringing him into the hotel room without repeating his Miranda warnings, the agents were impermissibly "interrogating" him.[2] Regardless of whether bringing him into the room constituted an interrogation, we cannot say that the District Court's conclusion that his comments were voluntary was clearly erroneous. The testimony of the agents, which the District Court found to be credible, (Joint Appendix at 116), indicated that after being given his Miranda warnings, defendant agreed to, and did answer questions.
 
 
 14
 In spite of his willingness to answer questions, defendant argues that he should have been given a fresh set of warnings before being taken into the hotel room because the agents planned to "interrogate" him regarding an offense unrelated to his initial arrest. In Colorado v. Spring, 107 S.Ct. 851 (1987), the Court recently rejected a similar argument, holding that the Constitution does not require that a defendant know precisely what information the police are seeking in order to effectively waive his rights. "[T]he failure of the law enforcement officials to inform [defendant] of the subject matter of the interrogation could not affect [defendant's] decision to waive his Fifth Amendment privilege in a constitutionally significant manner." Id. at 859. Defendant's statement in the room was properly admitted into evidence.[3]
 
 IV.
 
 15
 Defendant next argues that the trial court erred when it allowed the government to introduce testimony of prior bad acts on the part of the defendant. Defendant claims that the evidence should be excluded for a number of reasons. First, he claims that the government failed to specify the justification under Federal Rules of Evidence 404(b) for allowing the testimony. We reject this argument because the record indicates that the government's attorney specifically told the District Court that he expected the witness to testify as to "a common scheme and plan by Mr. Reginald Davis and Michaela McKinnie" to possess, and distribute cocaine. Second, defendant alleges that the District Court failed to undertake the required balancing of the probity of the evidence against the potential prejudice, as required by Rule 403. This allegation is also unsupported by the record. It is clear that the District Court did take Rule 403 into account, even though it did not specifically say so. Both attorneys argued this issue extensively at side bar, and defendant's attorney never specifically requested the District Court to balance the probity versus the potential prejudice on the record. In these circumstances, no on the record balancing is required. United States v. Sutton, 801 F.2d 1346, 1362 (D.C.Cir.1986) (no on the record balancing required where there was no request, and there was extensive argument on the issue).
 
 
 16
 Defendant further objects to the admission of the prior bad acts testimony on the grounds that the prior bad acts were not relevant to any disputed issue before the District Court. In United States v. Ismail, 756 F.2d 1253 (6th Cir.1985), this Court discussed the issue of prior bad acts in a very similar situation. Like the case at bar, a defendant who was convicted of conspiring to distribute illegal narcotics objected to the admission of defendant's prior transactions involving illegal drugs. In upholding the admissibility of prior bad acts, the Ismail Court noted that "[t]he district court has broad discretion in balancing probative value against potential prejudicial impact." Id. at 1259 (citations omitted). Also, in United States v. Passerella, 788 F.2d 377 (6th Cir.1986), this Court allowed admission of evidence of prior drug dealings for the legitimate purpose of showing the background and development of the conspiracy.
 
 
 17
 In this case, we cannot say that the District Court abused its discretion in admitting this evidence. Defendant was charged with conspiracy to distribute cocaine. Therefore, it was entirely appropriate for the government to produce evidence that the defendant and Ms. McKinnie were involved in a common scheme to further that illegal goal. This testimony was admissible because it was directed at proving the conspiracy charge. The witness lent credence to the conspiracy charge by testifying about various occasions where she witnessed defendant and Ms. McKinnie engaging in large cocaine transactions over a period of years.
 
 V.
 
 18
 Defendant's next claim on appeal is that there was insufficient evidence from which a jury could convict him of the charges of conspiracy to possess with intent to distribute cocaine, and of distribution of cocaine. In determining whether there was sufficient evidence to support a conviction, an appellate court, viewing the evidence in the light most favorable to the government, and drawing all reasonable inferences favorable to the government, can only reverse a conviction if it "can be said that no rational trier of fact could find guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 317 (1979).
 
 
 19
 We find no merit in defendant's argument that the evidence was insufficient to convict him of the conspiracy charge and the distribution of the cocaine. There was evidence from which the jury could find defendant distributed cocaine to McKinnie. The quantity of cocaine he retained in his suitcase was sufficient to establish possession with intent to distribute. There was also sufficient evidence to prove a conspiracy between defendant and McKinnie to distribute cocaine.
 
 VI.
 
 20
 Defendant's final claim on appeal is that he was improperly sentenced. During the oral sentencing, the District Court sentenced him to 15 years in prison on the first count, and then stated that "Counts II and III are to run consecutively to Count I." Joint Appendix at 157. However, the District Court did not specify whether Counts II and III should run concurrently, or consecutively to each other. The next day the judge signed the judgment and commitment order. This order was similar to the transcript of the oral sentence except that a line was added stating that "Count 3 is to be served consecutively to Counts 1 and 2." Id. at 12.
 
 
 21
 Although an unambiguous oral order generally controls over a written judgment, "[w]hen an orally pronounced sentence is ambiguous, however, the judgment and commitment order is evidence which may be used to determine the intended sentence." United States v. Villano, 816 F.2d 1448, 1451 (10th Cir.1987). Here the additional sentence in the written judgment makes clear that the District Court intended the Counts II and III run consecutively.
 
 
 22
 For the foregoing reasons, we AFFIRM the judgment below.
 
 
 
 [1]
 United States v. Oswald, 783 F.2d 663, 665-66 (6th Cir.1986). In Oswald, defendant tried to suppress 4.4 pounds of cocaine found in a car he had been driving from Florida to Michigan. After the car caught on fire in Tennessee, the defendant left the scene to avoid being caught with the cocaine. Eventually, after the fire was put out by emergency units, a police officer found the suitcase containing the cocaine. The defendant tried to suppress this evidence. The district court allowed the evidence and this Court agreed because the defendant had abandoned the vehicle. On appeal this Court affirmed the district court's decision not to suppress the evidence
 
 
 [2]
 Defendant also argues that this statement should be suppressed because it is the fruit of the illegal search of the hotel room. Of course this argument is without merit because we have determined that the search was lawful
 
 
 [3]
 Our holding that this statement was admissible also removes any potential taint from the defendant's subsequent statement after being taken to the federal building in Detroit