884 F.2d 580
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
David HAVLOVIC, Defendant-Appellant.
 No. 88-5380.
 United States Court of Appeals, Sixth Circuit.
 Aug. 25, 1989.
 
 Before DAVID A. NELSON and BOGGS, Circuit Judges, and RICHARD ENSLEN, District Judge.*
 PER CURIAM.
 
 
 1
 This is an appeal from a conviction on a federal narcotics charge. The defendant, an airline passenger traveling from Tucson to Cincinnati under an assumed name, was arrested at the Greater Cincinnati Airport after having been met there by a man whom the police had reason to believe was planning to pick up cocaine from a passenger coming into the airport from Arizona. While held in an airport police station pending issuance of a search warrant, the defendant surreptitiously removed a packet of cocaine from his cowboy boot and hid it in a desk drawer. Discovery of the cocaine by the police led to the defendant's indictment.
 
 
 2
 Contending that the evidence against him had been obtained through unconstitutional means, the defendant moved to suppress it. The district court denied the motion to suppress. We believe that the court's ruling was correct, and we shall therefore affirm the conviction.
 
 
 3
 * A hearing on the motion to suppress was held before a magistrate, and extensive testimony was taken from Officer Marvin Hedges, of the Greater Cincinnati Airport Police Department. The sequence of events described by Officer Hedges may be summarized as follows.
 
 
 4
 On the afternoon of August 13, 1987, Officer Hedges received word that one William C. Brown was headed for the Cincinnati airport to meet someone who was coming from Arizona and who would be carrying cocaine. A suburban police department had learned of Mr. Brown's plans through an informant and had passed the information on to the airport and federal authorities.
 
 
 5
 Mr. Brown was followed to the airport by federal agents, and they pointed him out to Officer Hedges upon their arrival at around 4:30 p.m. Officer Hedges, who was not in uniform, kept Mr. Brown under surveillance for a time. He watched Mr. Brown check certain flight information and use the telephone. Shortly after 5:00 p.m. Officer Hedges overheard part of a telephone conversation in which Mr. Brown told someone, "He's in Chicago," and, "I can't wait two hours." Brown subsequently left the airport.
 
 
 6
 Officer Hedges then ascertained from an airline employee that a two-hour delay had been posted for United Airlines Flight 570, a flight from Chicago to Cincinnati. The officer was also told that this flight connected in Chicago with one from Arizona. Flight 570 had originally been scheduled to leave Chicago at 4:54 p.m. Chicago time, or 5:54 p.m. Cincinnati time.
 
 
 7
 After reporting to his office and attempting to locate a dog trained to detect narcotics, Officer Hedges returned to the United Airlines terminal sometime after 7:00 p.m. He found that Mr. Brown had reappeared in the terminal, evidently with a view to meeting Flight 570. Mr. Brown was barefooted, at this point, but someone told him he could not stay in the terminal like that; Brown then went to a parking lot and returned wearing socks, but no shoes.
 
 
 8
 Mr. Brown was accompanied by another man, and they both appeared nervous; they could not sit still, Officer Hedges testified, and they kept looking up and down the concourse throughout the 35 to 40 minutes they spent awaiting the arrival of the delayed flight from Chicago.
 
 
 9
 When the plane finally landed, Mr. Brown and his companion were at the gate to meet it. One of the last passengers to disembark was an unshaven, causally dressed man who proved to be David Havlovic, the defendant in this case. Mr. Brown and his cohort spoke with Mr. Havlovic in low tones, checked the surrounding area as if to see whether they were being watched, and proceeded up the concourse, followed by Officer Hedges. One or another of the trio looked back over his shoulder on several occasions.
 
 
 10
 When they reached the baggage claim area, the men proceeded through it without claiming any luggage. It was a few minutes after 9:00 p.m. Officer Hedges stopped the men at this juncture, displayed his police badge, and asked if he could speak with Mr. Havlovic. "Sure," Havlovic replied. Officer Hedges asked to see his airplane ticket, and Mr. Havlovic produced one bearing the name "David Arnett."
 
 
 11
 The ticket, which showed that it had been paid for in cash, covered transportation that day from Tucson to Chicago to Cincinnati. When asked for identification, Mr. Havlovic nervously took a driver's license out of his wallet, his hands visibly shaking. The name on the license was not David Arnett, but David Havlovic. Mr. Havlovic told the officer that he sometimes used an alias, but gave no reason for doing so.
 
 
 12
 Officer Hedges asked Mr. Havlovic if he would step into a nearby first-aid room and voluntarily submit to a search of his person and a carry-on bag and package that he had with him. Havlovic said nothing, but he entered the room, followed by Officer Hedges and a uniformed police sergeant who had joined them.
 
 
 13
 Once inside the room, the sergeant asked Mr. Havlovic about a protrusion in the latter's groin area. Mr. Havlovic unzipped his pants and showed that he had nothing concealed there. Officer Hedges then asked for consent to search further, explaining (as he had done earlier) that Mr. Havlovic had the right to allow such a search or refuse it. "What happens if I refuse?" Mr. Havlovic asked. The officer replied that he would try to get a search warrant, because he suspected Mr. Havlovic of carrying narcotics. "I believe I better call my lawyer," Mr. Havlovic said.
 
 
 14
 Officer Hedges made out a receipt for the carry-on bag and package, intending to hold them until he could get a search warrant. The officer told Havlovic, as he testified on cross examination, that the search he wanted to conduct would include removal of the cowboy boots Havlovic was wearing. "At the word boots," according to the testimony, "Mr. Havlovic went in the offensive, as if to say--held up his hands, 'Don't touch me. I want to call my lawyer' or 'Maybe I better call my lawyer.' "
 
 
 15
 Mr. Havlovic eventually succeeded in reaching his lawyer by telephone, and was advised "not to consent or sign anything." Officer Hedges wanted to have Havlovic driven to the police station in a police cruiser, but it was against departmental policy to transport a suspect in a cruiser without patting him down first, and Mr. Havlovic refused to be patted down. Officer Hedges therefore walked him over to the police station, arriving at about 9:45 p.m.
 
 
 16
 Mr. Havlovic was given a seat in a "processing room," and Officer Hedges, after meeting briefly with the federal agents and suburban police officers involved in the case, told Havlovic that he should consider himself under arrest. Officer Hedges did not conduct any search at this time, but proceeded instead to prepare a search warrant affidavit with the help of an assistant prosecutor.
 
 
 17
 A search warrant was obtained shortly after midnight. A few minutes before that time Mr. Havlovic was moved from the processing room to Officer Hedges' office so that a breathalizer in the processing room could be used on a drunken driving suspect. Mr. Havlovic remained in Officer Hedges' office, seated at the latter's desk, for 30 minutes or so. When the warrant arrived at about 12:30 a.m. Mr. Havlovic was taken back to the processing room to be searched.
 
 
 18
 Nothing was found on Mr. Havlovic's person. Approximately five minutes after Mr. Havlovic vacated Officer Hedges' office, however, a policeman who was standing in the doorway noticed that the bottom right drawer of the desk at which Mr. Havlovic had been sitting was partially open. The policeman looked inside the drawer and discovered a packet of cocaine. Officer Hedges testified that he had looked in the drawer at about 7:00 p.m. and the package was not there then. No one other than Mr. Havlovic had sat at the desk in the interim.
 
 
 19
 Mr. Havlovic was stripped to his underwear in the course of the search, and his outer clothing was placed in a room where the various items were sniffed by a trained police dog. Mr. Havlovic's left boot evoked "biting, scratching, barking" from the dog--an indication that there had been narcotics in the boot. The clear implication was that while seated at the desk, Mr. Havlovic had removed the packet of cocaine from his cowboy boot and secreted it in the desk drawer.
 
 II
 
 20
 Following his indictment, Mr. Havlovic moved for an order suppressing the evidence against him "for the reason that said evidence was obtained as a result of an unconstitutional seizure of Defendant." After conducting an evidentiary hearing on the motion, the magistrate filed a report and recommendation in which he concluded that although the initial detention of Mr. Havlovic had been justified under Terry v. Ohio, 392 U.S. 1 (1968), the detention had quickly escalated into a full-scale arrest that was not justified by probable cause.
 
 
 21
 The United States filed objections to the magistrate's report. After careful review and consideration of the record, the district court (William Bertelsman, J.) decided that the objections were well-taken and that there had been probable cause for the arrest. The motion to suppress was denied on this ground, and on the independent ground that defendant Havlovic lacked standing to object to the seizure of the cocaine because he had not demonstrated a reasonable expectation of privacy in the drawers of Officer Hedges' desk.
 
 
 22
 Following the court's denial of the motion to suppress, Mr. Havlovic was allowed to enter a conditional plea of guilty to one count of the indictment, reserving the right to appeal his conviction on the ground that the motion to suppress evidence ought to have been granted. (See Rule 11(a)(2), Fed.R.Crim.P., which authorizes such conditional pleas with the approval of the court and the consent of the government.) This appeal followed.
 
 III
 
 23
 For an investigatory seizure to be legal, "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). The Cortez case outlined a two-step analysis--followed by this circuit in United States v. Tolbert, 692 F.2d 1041 (6th Cir.1982)--for determining whether the detaining officers had a properly particularized suspicion of their detainee. First, the court is to consider the inferences the police officer may have drawn from "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers." Cortez, 449 U.S. at 418. Second, the objective information "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." Id.
 
 
 24
 In the present case, the police had reason to believe that William Brown--who had himself acted as a police informant in the past--had "crossed the line" and was expecting a cocaine shipment from Arizona. The police saw Mr. Brown waiting for an incoming plane that had a connection from Arizona, and they saw Mr. Brown meet Mr. Havlovic when the latter left the plane. The men appeared nervous, and Mr. Havlovic proved to have been traveling on a ticket paid for in cash and issued in a name not his own. Such conduct is typical of drug couriers, and we think Officer Hedges clearly had "a particularized and objective basis" for suspecting the person met by Mr. Brown of criminal activity. That suspicion was supported by "objective observations ... and consideration of the modes or patterns of operation of certain kinds of lawbreakers." To have let Mr. Havlovic simply get away would have been almost unthinkable, in our view.
 
 
 25
 This case is similar, in some respects, to United States v. Sokolow, 490 U.S. ---, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Drug enforcement agents had learned, in Sokolow, that a nervous-looking man had bought airplane tickets in Honolulu for travel by himself and a female companion to Miami and back. The tickets were paid for in cash. The couple did not check any baggage before departing, and they were scheduled to return three days later. When they got back, the couple were detained by federal agents who asked for identification. The man responded that he had neither his ticket nor any identification, and he told the agents that the name in which he purchased the tickets was not his real name. The couple were then escorted to a police station at the airport, where a trained dog showed interest in one of the man's bags. The Court held that these factors were sufficient to justify a seizure. "Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion." 109 S.Ct. at 1586, 104 L.Ed.2d at 11.
 
 
 26
 In the case at bar, similarly, Mr. Havlovic paid cash for his ticket; he did not have any baggage checked; he appeared nervous; and he was traveling under a name not his own. But unlike the suspect in Sokolow, the defendant in the instant case was met by an individual whom the police had been told would be picking up a drug shipment that day. This was a highly suspicious circumstance, obviously, of the most particularized kind, and it makes this a far easier case than Sokolow.
 
 
 27
 The role played by Mr. Brown distinguishes this case from United States v. Clardy, 819 F.2d 670 (6th Cir.1987). There, the defendant was subjected to an investigatory detention as he was entering a taxi at the Cincinnati airport. The officers detaining the defendant had been notified of his arrival by a federal drug agent who had seen the defendant change planes from Miami in Atlanta in the company of a suspicious person who was wearing sunglasses and a lot of jewelry. The defendant had given the airline ticket counter a call-back telephone number which, when called, was answered by someone who did not know the men. We held that this information was insufficient, standing alone, to justify the seizure of the defendant upon his arrival in Cincinnati. But in the present case, as was not true in Clardy, the police were acting on an informant's tip that tied the defendant to a particular individual thought to be picking up a shipment of cocaine from the same state that the defendant was coming from. "An informant's tip is sufficient to establish reasonable suspicion; it need not be based exclusively on an officer's personal observations." United States v. Hardnett, 804 F.2d 353, 356 (6th Cir.1986), quoting Adams v. Williams, 407 U.S. 143, 147 (1972).
 
 
 28
 The magistrate's conclusion that there was no probable cause for an arrest in this case rested largely on Florida v. Royer, 460 U.S. 491, 500 (1983). There a suspected drug courier was questioned in an airport concourse and was then ordered to accompany the police to a nearby office, where he was detained for fifteen minutes while the police obtained his suitcases from the airline and brought them to the room. A four-judge plurality found no probable cause that could justify an arrest. All the police had to go on in Royer, however, was the fact that the defendant exhibited some of the characteristics of the typical drug courier. "We cannot agree with the State, if this is its position, that every nervous young man paying cash for a ticket to New York City under an assumed name and carrying two heavy American Tourister bags may be arrested and held to answer for a serious felony charge." Id. at 507. Here, of course, the presence of Mr. Brown gave the authorities much more reason for suspicion.
 
 
 29
 If the police did not have probable cause to arrest Mr. Havlovic, moreover, we agree with the district court that Havlovic had abandoned the cocaine and therefore lacked standing to contest its admissibility. See United States v. Oswald, 783 F.2d 663, 666 (6th Cir.1986): "Whether property has been 'abandoned,' in this sense, does not depend on where legal title rests, or whether one asserting a Fourth Amendment right has a legally enforceable possessory interest in the property; the question, rather, is whether the person claiming the protection of the Fourth Amendment 'has a legitimate expectation of privacy in the invaded place.' " Mr. Havlovic had no legitimate expectation of privacy in Officer Hedges' desk drawer.
 
 
 30
 The magistrate thought that any "affirmative disclaimer" by Havlovic of his rights in the abandoned cocaine would be voided by the fact that the disclaimer was "prompted" by an unconstitutional arrest. But if the arrest here was unconstitutional--which we do not believe it was--we would be hard pressed to say that it was the arrest that "prompted" the abandonment, rather than the prospect of a search conducted under a duly issued search warrant. By placing the cocaine in the desk drawer, the defendant removed it from the scope of Fourth Amendment protection surrounding his person and those items of property in which he had a "reasonable expectation of privacy." No one asked him to hide the cocaine in the drawer, and we think he abandoned it voluntarily.
 
 
 31
 The defendant's conviction is AFFIRMED.
 
 
 
 *
 The Honorable Richard Enslen, United States District Judge for the Western District of Michigan, sitting by designation