UNITED STATES of America, Plaintiff–Appellee,

v.

Jose B. BUENO, Defendant–Appellant.

No. 93–6083.

United States Court of Appeals, Sixth Circuit.

Argued March 1, 1994.

Decided April 11, 1994.

David Bunning, Asst. U.S. Atty., (briefed), Lexington, KY, Frederick A. Stine, V, Asst. U.S. Atty. (argued), Covington, KY, for plaintiff-appellee.

Martin S. Pinales (briefed), Edmund McKenna (argued), Sirkin, Pinales, Mezibov & Schwartz, Cincinnati, OH, for defendant-appellant.

Before: KENNEDY and GUY, Circuit Judges; and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Defendant-appellant, Jose B. Bueno, appeals his conviction and sentence for violation of 21 U.S.C. section 841(a)(1) for possession with intent to distribute approximately 5.2 pounds of cocaine. For the following reasons, we affirm in part and reverse in part.

I.

On January 20, 1993, Sergeant Bunning of the Cincinnati/Northern Kentucky International Airport Police Department was conducting routine surveillance at the Delta terminal of the airport, watching an arriving flight from New York, which is a known source city for narcotics. Defendant caught Sergeant Bunning's attention because of the people departing from a businessman flight, he was the only person wearing faded blue jeans, an LA Raiders shirt, and a leather jacket. Bunning observed defendant walking past the flight attendants stationed at the gate, who were to direct passengers to connecting flights, and going down the con-

course. Before approaching another gate, defendant made a three-hundred-sixty degree turn, looking around as if to see if anyone were watching him. Defendant spoke to a flight attendant at another gate and then proceeded onward. Sergeant Bunning followed defendant in the direction he was walking and saw him check into a flight at gate 15 and then walk away. Sergeant Bunning then went to the gate–15 Delta ticketing agent and checked the list of inbound connections in order to determine which passengers were connecting from New York. There were only two passengers who were connecting from New York. Their tickets had been issued in the names of H. Cabot Lodge and Ralph Alicia. Sergeant Bunning discounted Mr. Lodge upon learning that he was a Delta frequent flyer using first class. Upon further checking on Ralph Alicia's reservation, Sergeant Bunning learned that he had purchased a one-way ticket` for $749.00 cash forty-one minutes before the flight, which had a final destination of Anchorage, Alaska with a connection in Salt Lake City. Sergeant Bunning recalled that about one month earlier, a bag that was supposed to be transported from New York to Anchorage had ended up in Cincinnati by mistake and was found to contain a kilogram of cocaine. Bunning also knew that a large amount of cocaine was being transported from New York to Anchorage, Alaska.

Based on his suspicion that defendant was dealing in narcotics, Sergeant Bunning decided to approach defendant and requested that Detective McKenzie accompany him to ask defendant some questions. They found defendant leaving a gift shop. Bunning showed defendant his credentials and badge and asked to talk to him a few minutes. Defendant agreed to speak to Sergeant Bunning and when asked, produced a certified identification with the name of Ralph Alicia on it with a New York address and photograph. However, Sergeant Bunning recognized that the identification was one that could easily be obtained from a street vendor and was not issued by an official authority. Sergeant Bunning testified at the suppression hearing that this type of identification further indicated to him the possibility that defendant was involved in criminal activity. Upon question-

ing, defendant could not recall the city of his final destination until prompted by Sergeant Bunning. Sergeant Bunning then asked to see defendant's airline ticket; defendant consented and handed Sergeant Bunning the ticket. When Sergeant Bunning examined the ticket, he noticed that it had a baggage claim attached to it. The name on the ticket was Ralph Alicia, matching the name on the in-bound flight connection sheet. The officers testified that they immediately gave defendant back his plane ticket and his identification. During the course of this interview, the conversation was entirely in English, although defendant spoke with a heavy Spanish accent. During the time they spoke with defendant, Sergeant Bunning and Detective McKenzie did not display any weapons or touch defendant in any way.

According to the testimony of the officers, after their initial conversation with defendant, they asked if they could search his carry-on bag and defendant consented. Sergeant Bunning then suggested to defendant that the search be conducted in a side hallway of the airport rather than on the main concourse, which was very crowded. Defendant agreed that he preferred to move into the hallway. Defendant's version of the story is that he was asked to move into the hallway before the officers asked to see his identification, his ticket or permission to search his carry-on bag. In order to get into the hallway, Sergeant Bunning had to unlock the door by entering numbers on an electric keypad. Although the door had to be unlocked electronically in order to proceed from the terminal into the hallway, once in the hallway, one did not need to unlock the door in order to get back out to the concourse; the door simply opened. Defendant testified that he was unaware of this and believed he was locked in the hallway. The hallway was a stairwell landing area which was approximately ten by fourteen feet.

After entering the stairwell, the officers testified that they again asked defendant if they could search his carry-on bag and that he agreed. In the bag they found baby clothes, diapers, children's crayons, and a pair of pants. According to the officers, Sergeant Bunning then asked defendant if he

could search his person and defendant agreed. After conducting a pat-down search, Sergeant Bunning located defendant's wallet, removed it, and then asked his permission to search the wallet, which defendant granted. Inside defendant's wallet, Sergeant Bunning found a New York driver's license with defendant's photograph and the name Jose Bueno on it. Sergeant Bunning then advised defendant that Kentucky state law prohibited giving a false name to a police officer, and defendant admitted that his real name was Jose Bueno. Defendant alleged that he was using the fictitious name of "Alicia" in order to check into hotels after he argued with his wife. Officer Bunning testified that he asked defendant if he could search his checked baggage, remembering that he had seen a baggage claim check when he had examined defendant's airline ticket earlier. Defendant first denied that he had any checked baggage, but after being reminded that there was a claim check on his ticket, he acknowledged that he did have checked baggage. Sergeant Bunning testified that defendant consented to the search and that he had checked a small green bag.

According to defendant, he was questioned in the stairwell, asked to produce his ticket which he handed over, and then asked for identification, which he took out of his wallet. Defendant testified that Sergeant Bunning then took the wallet from him and searched through it without his permission, finding his driver's license under the name of Bueno. Defendant also stated that the officers asked him where his checked luggage was, but never asked permission to search it.

After receiving permission to search his checked bag, the officers advised defendant that he could board his flight. From the area of aircraft operations, they retrieved the bag which corresponded to the claim check number on defendant's ticket. The bag was a three-foot high black canvas bag, and inside they found a detergent box with approximately five pounds of cocaine wrapped in cellophane with coffee grounds around it. The officers then boarded the Salt Lake City flight and placed defendant under arrest. Defendant was not advised of his *Miranda* rights until after he was arrested.

On February 10, 1993, defendant was indicted by a federal grand jury for the Eastern District of Kentucky. He was charged with one count of possession with intent to distribute approximately 5.2 pounds of cocaine in violation of 21 U.S.C. section 841(a)(1). Defendant filed a motion to suppress evidence on March 3, 1993. On March 11, 1993, an evidentiary hearing was held, and on May 28, 1993, the motion to suppress was denied. On June 3, 1993, defendant entered into a conditional plea of guilty pursuant to Rule 11(a)(2), reserving his right to appeal the district court's order on the suppression motion. A presentence investigation report was filed, which defendant objected to for giving him a two-level increase under the obstruction of justice guideline. The district court overruled the objection and on August 12, 1993, sentenced defendant to 66 months imprisonment, five years supervised release, and a mandatory assessment of $50.00. Defendant timely filed this notice of appeal.

## II.

■ Defendant first argues that he was seized by officers Bunning and McKenzie in violation of the Fourth Amendment and that this seizure tainted any consent to search his luggage which he might have given.

We will first determine if an unreasonable seizure occurred. Under the Fourth Amendment, there are three types of permissible encounters between the police and citizens: consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or *Terry* stop which must be predicated upon "reasonable suspicion;" and arrests which must be based on probable cause. *United States v. Flowers,* 909 F.2d 145, 147 (6th Cir.1990); *United States v. Ushery,* 968 F.2d 575, 579 (6th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 392, 121 L.Ed.2d 301 (1992). Defendant argues that when he was moved into the stairwell hallway, he was, in effect, arrested without probable cause in violation of the Fourth Amendment. Defendant relies on the Supreme Court decision in *Florida v. Royer,* 460 U.S.

491, 501–03, 103 S.Ct. 1319, 1326–27, 75 L.Ed.2d 229 (1983) for this argument. In *Royer*, the police identified themselves as narcotic agents, told defendant Royer that he was suspected of transporting narcotics, and then asked him to accompany them to the police room in the airport while retaining his ticket and driver's license and without indicating in any way that he was free to depart. *Id.* at 501, 103 S.Ct. at 1326. Without defendant Royer's consent, one of the detectives retrieved his luggage from the airline baggage claim and brought it to the police room where Royer gave his consent to search the luggage. Marijuana was found in the luggage. The Supreme Court determined that the motion to suppress the contents of the search should have been granted because Royer had been involuntarily confined within the small room without probable cause and that at the time his consent to search was obtained, the involuntary detention had exceeded the limited restraint permitted by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Any consent given was therefore invalid because tainted by the unlawful confinement. *Id.* at 503, 103 S.Ct. at 1327. In the present case, defendant argues that any consent he may have given was tainted by his unlawful confinement in the stairwell.

We disagree. We find the present case distinguishable from *Royer*, because a consensual encounter between defendant and the police turned into a legitimate temporary detention based on reasonable suspicion, not an arrest. Defendant's detention in the hallway was not an illegal seizure, because it was supported by reasonable suspicion and did not exceed the limited restraint permitted for an investigative stop. *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). To the degree that there were differences in the officers' and defendant's testimony, the district court credited the officers' version of what occurred. We must accept this determination unless it is clearly erroneous, for credibility determinations are for the trial court to decide rather than the appellate court. *United States v. Crousore*, 1 F.3d 382, 386 (6th Cir. 1993). Moreover, the district court chose to believe Sergeant Bunning's testimony over

that of defendant, in part, because it was corroborated by Detective McKenzie. We do not find that this credibility determination was clearly erroneous.

■ In the present case, according to the officers' testimony, Sergeant Bunning's initial approach to defendant at the airport was a permissible consensual encounter. *United States v. Tillman*, 963 F.2d 137, 142 (6th Cir.1992) (a seizure does not occur simply because a police officer approaches a person and asks a few questions). Sergeant Bunning approached defendant on the concourse, identified himself as a police officer, and then asked defendant a few short questions about his identity and travel itinerary, which defendant willingly answered. Moreover, according to the officers, these questions were posed in a calm and non-threatening way and at no time did the officers display their weapons or physically touch defendant. Also according to the officers, when defendant was asked to produce his ticket and identification, he voluntarily complied, and the ticket and identification were promptly returned to him. Defendant then consented while on the airport concourse to a search of his carry-on bag. This scenario is distinguishable from *Royer* where the police took the defendant's ticket and identification from him, told him he was suspected of dealing in narcotics, and ordered him to accompany them to the police room of the airport.

■ In the present case, we believe the outcome of the consensual encounter between defendant and the officers provided the basis for a legitimate investigative stop. After their brief questioning of defendant in which he willingly complied, the police officers had reasonable suspicion to believe that defendant was involved in criminal activity, and, therefore, could detain him briefly for further questioning for the following reasons:

1. Defendant first aroused the curiosity of Sergeant Bunning because of the way he was dressed, which in and of itself would not give rise to reasonable suspicion, but when coupled with the way defendant acted when he got off the plane, contributed to reasonable suspicion. When he got off the plane, defendant initially bypassed

the ticketing agents, who were to direct passengers to connecting flights, went down the concourse, made a three-hundred-sixty-degree turn, looking around as if to see if anyone were watching him, and then proceeded to ask another ticket agent, presumably, for directions. At the suppression hearing, Sergeant Bunning testified that in his experience, drug couriers often do not stop to ask the agents stationed at the gate for directions to the connecting flight, but try to get away as soon as possible, and then determine where the connecting flight is by other means.

2. Upon reviewing the connecting flight information sheet, Officer Bunning determined that defendant had booked a one-way ticket from New York to Cincinnati to Salt Lake City to Anchorage for $749.00 cash forty-one minutes before the departure of the flight. This action is consistent with a drug courier profile—paying a large sum of cash for a ticket immediately before a flight.

3. Officer Bunning was aware of a large amount of cocaine being transported from New York City to Anchorage. Moreover, one month earlier a bag, which should have gone to Anchorage, had been checked by mistake to Cincinnati with cocaine in it.

4. After defendant produced identification for the officers, Officer Bunning determined that the identification was the type that was readily available from any street vendor and was often carried by drug couriers to provide an alias, because it was not issued by any official authority.

5. When questioned, defendant could not remember his final destination until prompted by Officer Bunning.

Although any one of these factors is not by itself proof of illegal activity and is consistent with innocent travelers, these same factors, when combined, amount to reasonable suspicion to support a temporary detention. *United States v. Sokolow*, 490 U.S. 1, 9, 109 S.Ct. 1581, 1586, 104 L.Ed.2d 1 (1989).

■ We must next decide whether the limited restraint permitted for a legitimate *Terry* stop based on reasonable suspicion was exceeded when defendant moved from the airport concourse to the stairwell hallway. Once a court determines that a seizure has taken place, to establish that the detention was reasonable, "the government must show: (1) that the seizure was based on 'reasonable suspicion' of criminal activity; and (2) that the investigative measures used were the least intrusive means reasonably available to dispel the officer's suspicion in a short period of time." *United States v. Fountain*, 2 F.3d 656, 665 (6th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 608, 126 L.Ed.2d 573 (1993). In the present case, the officers testified that defendant was not ordered, but willingly agreed, to go with them to the stairwell so as not to embarrass himself by having his carry-on luggage examined on the crowded airport concourse. The officers testified that they returned defendant's ticket and identification to him before proceeding into the hallway, further indicating that they were not forcing him to go somewhere he did not want to go. Also, according to both officers, the tone of the conversation was nonthreatening, both in the concourse area and in the stairwell, and they did not engage in any overbearing or coercive behavior. The district court determined that the brief detention lasted no more than five minutes, which further distinguishes this case from *Royer* where the defendant was held until his luggage was retrieved. *See United States v. Fountain*, 2 F.3d at 665. Although the door to the hallway had to be electronically opened, the district court credited the officers' testimony that they had asked defendant if he preferred to move into the stairwell and that it was defendant who chose to move. This fact distinguishes the present case from other cases which have held that an illegal seizure, or arrest, can occur when officers order the suspect to accompany them to an area where he had not planned to go. *See e.g., United States v. Knox*, 839 F.2d 285, 290–93 (6th Cir.1988), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989); *United States v. Saperstein*, 723 F.2d 1221, 1223 (6th Cir.1983); *United States v. Tolbert*, 692 F.2d 1041, 1046 (6th Cir.1982), *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983); *United States v. Jefferson*, 650 F.2d 854, 856–57 (6th Cir.1981). In the present case, the following testimony was elicited

by Sergeant Bunning regarding the movement to the adjacent stairwell:

Q. What did [Appellant] say at that point?

A. He consented to my request, and I then asked him—I said we can do it right here where we are or we can move into a little hallway that was about five feet away from us, and he chose to be moved to the hallway.

Joint Appendix, p. 66. We must accept the district court's credibility determination concerning Sergeant Bunning's testimony that defendant was given the option of remaining on the concourse, but chose to move into the stairwell. *Crousore*, 1 F.3d at 386. Based on the officers' testimony, the district court concluded the entire encounter between the officers and defendant lasted approximately five minutes which does not exceed the limits imposed for an investigative detention. *See Fountain*, 2 F.3d at 665. Moreover, after the brief detention, defendant was allowed to leave the stairwell area and board his flight, whereas the defendant in *Royer* was detained while his bag was retrieved. The officers in the present case knew that at this point they did not have probable cause to arrest the defendant and therefore allowed him to leave after their brief detention. For these reasons, we do not believe that the move from the concourse to the stairwell converted the brief detention based on reasonable suspicion into an arrest lacking probable cause. Given that defendant consented to moving to the stairwell, there was no less intrusive means by which the police could have pursued their legitimate suspicions and the brief five-minute detention of defendant did not exceed the limited restraint permitted by the Fourth Amendment.

For these reasons, we do not find that defendant's consent to search his checked luggage was tainted by an illegal seizure as was the case in *Royer*.

## III.

■ We must next decide if defendant's consent to search his checked luggage was freely and voluntarily given. A warrantless search as occurred in the present case is valid if conducted pursuant to the person's consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). When seeking to justify a search based on consent, the government has the burden of showing by a preponderance of the evidence that the consent was "freely and voluntarily given," and was not the result of coercion, duress, or submission to a claim of authority. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). The voluntariness of the consent is determined by the "totality of the circumstances," *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2048, and must be proven by "clear and positive" proof. *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir.1977). Consent is a question of fact, and the district court's decision regarding consent will not be overturned unless it is clearly erroneous. *Id.* at 720.

Defendant first argues that he did not consent to the search of his checked bag. Alternatively, defendant argues his consent was obtained by duress and that his inability to understand the English language hindered his ability to give a free and voluntary consent.

The district court credited Sergeant Bunning's and Detective McKenzie's testimony that defendant had replied "yes," in response to their request to search his checked bag. This court will not disturb this determination as it is not clearly erroneous.

Furthermore, we do not believe this consent was the result of coercion or duress. Although defendant and the officers had moved from the concourse area to the stairwell when the consent was obtained, there were only two officers present, no weapons were displayed, no physical touching occurred, and the officers exhibited no overbearing behavior. We do not find that the physical surroundings of the stairwell alone were sufficient to create a hostile and intimidating atmosphere as defendant alleges. *See United States v. Knox*, 839 F.2d at 292. Defendant was never told that he could not leave the area, nor was he threatened with further detention if he refused to consent to a search of his checked luggage. In the totality of the circumstances, we thus find

that defendant's consent was not extracted by duress or coercion and was voluntary. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2048.

We also find defendant's argument that his inability to understand English precluded him from giving voluntary consent to be without merit. Defendant is a thirty-six-year-old naturalized United States citizen, who has lived in the United States in New York since 1986. Prior to being arrested, he studied engineering at a community college in New York, taking classes in both English and Spanish. The testimony of Sergeant Bunning and Detective McKenzie indicated that the entire encounter at the airport with defendant was in English and that he expressed no difficulty in understanding or responding to their questions.

The district court's conclusion that defendant sufficiently understood English in order to give voluntary consent to a search of his checked bag was also supported by the testimony of Deputy United States Marshal Dan McHugh. Deputy McHugh was working at the courthouse on the day defendant appeared for his initial appearance on January 20, 1993. Deputy McHugh, who processed defendant after his arrest, testified that defendant was able to follow his instructions in English in regard to the procedures for taking his fingerprints and taking his picture. McHugh testified that there was no language problem and that defendant did whatever he was told and did not seem to have any difficulty in understanding instructions in English. McHugh also testified that when he took defendant's personal history, defendant was able to answer all questions and that the only time that defendant had a problem with English was when he was asked his occupation. However, when McHugh rephrased the question and asked defendant what his job was, defendant was able to answer. The type of information that McHugh elicited from defendant included his date of birth, place of birth, his height, weight, color of eyes, color of hair, whether he had any tatoos, if he were addicted to any drugs, and if so, what type. Defendant also provided his current phone number and address and gave a description of his relatives in English.

In light of the testimony of Officers Bunning, McKenzie, and McHugh, the record supports the district court's decision that defendant's consent was not rendered involuntary by his inability to understand English. The district court's determination, which is a question of fact, was not clearly erroneous and is affirmed.

To conclude, for the reasons stated herein, the district court properly denied defendant's motion to suppress and is affirmed on this issue.

## IV.

Finally, we must decide whether defendant was properly given a two-level enhancement for obstruction of justice under United States Sentencing Guideline § 3C1.1, which provides:

> If the defendant wilfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

The commentary to section 3C1.1 lists perjury as an example of conduct to which the enhancement applies. In the present case, the district court determined that defendant had perjured himself at the suppression hearing because he had testified that he did not understand English at all. Specifically, the district court stated at the sentencing hearing:

> [T]he court does find [defendant] did commit perjury with regard to his ability to understand English, with regard to his transactions at the airport; and the evidence was I believe he had taken several courses in English, *and he said he understood no English at all,* and he had quite a bit of familiarity with English and no problem when the marshal empaneled him. And the court said on page 18 [of its order denying the motion to suppress] these are obvious prevarications—that's a fancy word for perjury if an oath had been administered—and the court will reiterate those findings.

Joint Appendix, p. 146. (emphasis added).

█ We find the district court's factual finding that defendant committed perjury at

**128**

the suppression hearing by stating that he understood no English at all to be clearly erroneous. As the record indicates, at the suppression hearing defendant Bueno testified that he could understand certain things in English (Appendix, p. 130–131), that he was taking some courses given in English and did not need an interpreter for those classes (Appendix, p. 134), and that he had answered the police officers' questions at the airport in English whenever he could (Appendix, p. 112). When the district court asked defendant Bueno outright, "How much English do you speak?", Bueno responded through an interpreter, "Well, I can speak." When the court asked, "Do you understand what I'm saying right now?", Bueno answered, "Certain things, yes." (Appendix p. 138). Therefore, we find the district court erred in finding that at the suppression hearing defendant had stated that he could understand no English at all. Because we find there is insufficient evidence to support the district court's conclusion that defendant testified untruthfully, we must reverse the district court on this issue. We note that both the sentencing guidelines and the federal courts require that "in respect to alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant." U.S.S.G. § 3C1.1, Application Note One. The "defendant should be given the benefit of [any] resultant doubt." *United States v. Akitoye,* 923 F.2d 221, 229 (1st Cir.1991) (citations omitted). "[A]n upward adjustment for obstruction of justice under U.S.S.G. § 3C1.1 requires more than a mere conflict in the trial testimony or a jury's rejection of a defendant's alibi or denial of guilt." *Id.* at 228–29. Although we rejected defendant's argument that he did not understand English well enough to give valid consent, we do not believe that by raising this defense, he obstructed justice within the meaning of U.S.S.G. § 3C1.1. For this reason, the district court is reversed on this issue.

## V.

To conclude, the district court is affirmed in part and reversed in part. The district court's denial of defendant's motion to sup-

press is hereby **AFFIRMED.** The district court's two-level enhancement of defendant's base offense level for obstruction of justice under U.S.S.G. § 3C1.1 is hereby **REVERSED,** and the case is **REMANDED** for proceedings consistent with this opinion.