**UNITED STATES of America,**
**Plaintiff–Appellant.**

v.

**Antonio Rodriguez MAGANA,**
**Defendant–Appellee,**

No. 02–5208.

United States Court of Appeals,
Sixth Circuit.

July 25, 2003.

Before KENNEDY and COLE, Circuit Judges; and WILLIAMS, District Judge.*

KENNEDY, Circuit Judge.

Defendant Antonio Rodriguez Magana was indicted for one count of knowingly "attempting to possess, obtain, and receive . . . [counterfeit] alien registration receipts cards, commonly called 'green cards,'" in violation of Title 18 U.S.C. §§ 2 and 1546(a) and for two counts of knowingly and willfully making materially false statements and representations to both a United States Post Office clerk and postal inspector in violation of Title 18 U.S.C. §§ 2 and 1001. The United States appeals the district court's order holding that *Miranda* warnings were necessary because agents seized the Defendant under the Fourth Amendment at the time that they asked him to accompany them voluntarily for a show-up and suppressing the evidentiary fruits from that illegal seizure. For the reasons explained below, we reverse the district court's suppression order.

## I. Facts

On Monday, August 13, 2000, a man entered the Franklin Post Office and asked a postal clerk about a package that he was expecting. The man identified himself as "Andreas Mayer."[1] and provided information regarding the parcel number, the sender, and the apartment number to which the post office should deliver the package. On Tuesday, August 14th, the government discovered that the package in question[2] contained over 600 counterfeit social security and alien registration cards. On that same day, the government executed a controlled delivery of the package to Royal Oaks Apartments, number 1603, in Franklin, Tennessee-the residence of Defendant Magana and some other individuals. Federal authorities arrested two individuals who were at the apartment at the time of the delivery, one of whom was the Defendant's relative.

On Thursday, August 16th, acting on the postal clerk's information concerning "Andreas Mayer," Secret Service Agent Colby Biggers, Postal Inspector Gordon Wilson, and Immigration and Naturalization Service (hereafter "I.N.S.") Agent Robert Kinghorn went to apartment 1603 at the Royal Oaks complex-the apartment that "Andreas Mayer" indicated for delivery. Upon approaching, Agent Biggers saw two Hispanic males and one Caucasian male standing in the breezeway in front of the apartment. Agent Biggers saw that one of the Hispanic males-later identified as Defendant Magana-readily matched the physical description of "Andreas Mayer" that the postal clerk had given.

After "focusing his attention" on Defendant Magana and "casually approaching" the three individuals, Agent Biggers identified himself as a Secret Service Agent. Agent Biggers asked the three individuals if any of them lived in apartment 1603. Defendant Magana answered "yes." The Defendant stated that one of the other individuals present stayed there as well. The Defendant also volunteered that his sister lives two apartments over in the same complex. After Agent Biggers

---

* The Honorable Judge Glen M. Williams, United States District Judge from the Western District of Virginia, sitting by designation.

1. This is the first of two false misrepresentations for which the Defendant has been indicted.

2. The recovered package was addressed to "Andreas Mayer" at 300 Royal Oaks Boulevard; its parcel number and return address also matched the information that "Andreas Mayer" had provided to the postal clerk the day before.

asked Defendant Magana his name, the Defendant stated that it was "Antonio Rodriguez Magana." producing his driver's license for which Agent Biggers asked. Answering Agent Biggers' question about whether Defendant Magana drives, the Defendant stated that his car had a flat tire, and that he and the Hispanic companion there were going to change it. Defendant Magana asked Agent Biggers if he had any information on why agents had arrested one of the Defendant's relatives at the apartment earlier. Agent Biggers told the Defendant that Biggers had participated in the arrest, which was for receiving a package of counterfeit documents. Defendant Magana volunteered that he had visited that relative in county jail. Agent Biggers asked the Defendant whether he had ever been to the Franklin Post Office. Defendant Magana stated that he had been there about a month before.

Around that time, Postal Inspector Wilson and-sometime later-I.N.S. Agent Kinghorn joined the group, having taken another route to the apartment. I.N.S. Agent Kinghorn asked the Defendant if he would willingly go to the post office concerning "the package to see if he had been there." After Defendant Magana stated that he would go, he asked what it was about. Agent Biggers told the Defendant that an individual had gone to the post office to try to obtain a package of illegal documents and gave that address. After Agent Biggers asked Defendant Magana whether he had been that individual, the Defendant stated that he had not.[3] Agent Biggers told the Defendant that "if he wanted to clear his name, the best thing to do was to go down there and if the clerk didn't recognize him[,] he'd be cleared." Agent Kinghorn suggested that Defendant Maga-

na voluntarily go down to the post office with them for a show-up to determine whether it was him. As all three agents testified, the Defendant was told several times that he was not under arrest, that he did not have to go with them if he did not want to, and that it was completely voluntary. Defendant Magana agreed to go to the post office with the agents.

The agents' conversation with Defendant Magana outside of the apartment, to which Agent Biggers testified as being casual, lasted about ten minutes. The record does not show that Postal Inspector Wilson ever spoke during this time. All three agents then walked with the Defendant to where they had parked their vehicles. Defendant Magana sat in the front seat of Agent Biggers' car, which Biggers drove, while Agent Kinghorn sat in the backseat; Postal Inspector Wilson drove his own vehicle. No conversations with the Defendant occurred on the drive to the post office. None of the agents touched or placed handcuffs on Defendant Magana at any time. Moreover, none of the agents' weapons were visible. After the postal clerk identified Defendant Magana as "Andreas Mayer," the agents placed the Defendant under formal arrest and administered *Miranda* warnings to him. After waiving such Miranda rights, Defendant Magana confessed to having tried to obtain the package at the post office.

Defendant Magana is a native of Mexico, and is an illegal alien. The agents' entire conversation with the Defendant was in English although Agent Kinghorn speaks Spanish. According to the agents and the postal clerk, the Defendant was fluent in English and spoke with little or no accent. Defendant Magana never testified concerning the suppression issue.

**3.** This is the second of two false misrepresentations for which the Defendant has been indicted.

## II.  Procedural History

Initially, the district court partly granted and denied Defendant Magana's motion to suppress his oral statements.  The district court held that Defendant Magana voluntarily, knowingly, and intelligently waived his *Miranda* rights at the post office, holding that the admissibility of any statements that the Defendant made after that time would survive such a challenge.  The district court also held that the agents "seized" Defendant Magana under the Fourth Amendment at the time that they asked him to accompany them voluntarily from outside of the apartment to the post office on the ground that a "reasonable person would not have believed that he was free to leave."  The district court then suppressed any statements that the Defendant made from that time *until* the Defendant received *Miranda* warnings at the post office.

The government moved for reconsideration.  On reconsideration, the district court ordered the suppression of all of the statements that the Defendant made *after* the agents seized him under the Fourth Amendment at the time that they asked him to accompany them voluntarily from outside of the apartment to the post office on the ground that the agents failed to administer *Miranda* warnings at that time.  Following the government's concession that the show-up, in which the postal clerk identified the Defendant as "Andreas Mayer," and the Defendant's post-*Miranda* statements would be the inadmissible fruit of any "earlier *de facto* arrest ... [lacking] probable cause," the district court held all evidence directly resulting from the illegal seizure inadmissible.

The government appeals the district court's suppression order and denial of reconsideration.  Specifically, the government challenges the district court's determination that the agents seized Defendant Magana under the Fourth Amendment at the time that they asked him voluntarily to accompany them from outside of the apartment to the post office for a show-up and, consequently, that *Miranda* warnings were necessary at that time.

## III.  Analysis

As the district court did not fully explain its reasoning in this case, we can only surmise how the district court arrived at the finding that Miranda warnings were required on the ground that, under the "free to leave" test, a Fourth Amendment "seizure" had occurred.  Perhaps the district court erroneously collapsed the Fourth Amendment and Fifth Amendment analyses, without recognizing that the Fourth Amendment "seizure" doctrine is not interchangeable with the Fifth Amendment *Miranda* doctrine.  *See United States v. Salvo*, 133 F.3d 943, 949 (6th Cir.1998) (holding that the Fourth Amendment's "free to leave" test may only be one of several factors in the "custody" inquiry where the seizure is not a *Terry* stop, in which, by its very nature, an individual is not free to leave).  A "seizure" under the Fourth Amendment does not necessarily comprise the "custody" necessary to trigger the Miranda doctrine under the Fifth Amendment.  *See Berkemer v. McCarty*, 468 U.S. 420, 435–437, 441, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (police roadside questioning of a motorist pursuant to a routine traffic stop is a Fourth Amendment "seizure" as the motorist would likely not feel free to not pull over or to leave the scene unilaterally; yet, it is not *necessarily* "custody" under *Miranda* as it is "presumptively temporary and brief" and typically "substantially less police-dominated."); *United States v. Brignoni–Ponce*, 422 U.S. 873, 878–880, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) ("The Fourth Amendment applies to all seizures of the person, including [*Terry* stops, which are] seizures that involve only a brief detention short of

a traditional arrest" and, thus, do not require probable cause to be reasonable.). Moreover, for the *Miranda* doctrine to apply, *both* custody and interrogation must exist. *See id.* at 434, 104 S.Ct. 3138.

Here, although the district court found that *Miranda* warnings were required, the district court made no explicit finding of "custody" as such or "interrogation" for *Miranda* purposes. To reconcile the district court's determinations with the correct legal framework, we must infer that the district court used the generic term "seizure" to describe what it found to be a constructive arrest. *See Dunaway v. New York*, 442 U.S. 200, 216, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (a *de facto* arrest is both "custody" under *Miranda* and a "seizure" requiring probable cause under the Fourth Amendment.); *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) ("Custody" occurs where police formally arrest the suspect or curtail his "freedom of movement" to a "degree associated with formal arrest."). The record's passing references to the challenged encounter as constituting "illegal custody" or an "illegal arrest" as well as the government's concession that the agents only had reasonable suspicion, not probable cause, while at the apartment building support this inference.

### A. The *Terry* Investigative Stop was Reasonable

We review the district court's legal conclusions in a suppression hearing *de novo* and its factual findings in a suppression hearing for clear error. *United States v. Smith*, 263 F.3d 571, 581 (6th Cir.2001). The trial court's determination as to whether the facts establish an unconstitutional seizure under the Fourth Amendment is a question of law that we review *de novo*. *United States v. Avery*, 137 F.3d 343, 348 (6th Cir.1997). Whether reasonable suspicion justifying a *Terry* stop exists is also a question of law that we review *de novo*. *Smith*, 263 F.3d at 582.

■ "[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony," then the police may make a *Terry* stop to investigate that suspicion. *United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). Here, under all of the circumstances, a reasonable person may not have felt free to disregard the agents' questioning and leave the scene. However, such a "seizure" did not exceed the legal bounds of a *Terry* investigative stop.

First, to establish that a *Terry* stop was reasonable, " 'the government must show ... that the seizure was based on 'reasonable suspicion' of criminal activity.' " *United States v. Bueno*, 21 F.3d 120, 125 (6th Cir.1994). A "reasonable suspicion" is "less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (internal quotation marks omitted). A basis in specific and articulable facts requires "more than an inchoate and unparticularized suspicion or hunch," but, rather, "some minimal level of objective justification for making the stop." *Id.* (internal quotation marks omitted). Here, upon encountering Defendant Magana outside of the apartment, the agents objectively had reasonable suspicion, grounded in specific and articulable facts, that the Defendant had been the individual who had identified himself as "Andreas Mayer" and inquired about the package containing the illegal documents. The Defendant had matched the physical description of "Andreas Mayer" in that he was an Hispanic male with dark, bushy hair and a slender build and was standing outside of the apartment that "Andreas

Mayer" had indicated for the package's delivery.

Second, the government must show that police used the "least intrusive [investigative] means reasonably available to dispel ... [their] suspicion in a short period of time" to demonstrate that a *Terry* stop was reasonable. *Bueno,* 21 F.3d at 125. This concerns the "length of the investigative stop," not "whether the police had a less intrusive means to verify their suspicions *before* stopping" the individual. *Sokolow,* 490 U.S. at 11, 109 S.Ct. 1581 (emphasis added). "The scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). In other words, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.* A *Terry* investigative stop may not entail "means that approach the conditions of arrest." *Id.* at 499, 103 S.Ct. 1319. Thus, when an investigative detention-even one for which reasonable suspicion exists-"occurs over an unreasonable period of time or under unreasonable circumstances," it becomes an arrest. *Avery,* 137 F.3d at 349.

Here, the investigative stop did not mature into a constructive arrest as it entailed neither an unreasonable length of time nor unreasonable circumstances. During the *Terry* stop, which lasted only ten minutes, the agents asked Defendant Magana only those questions that were pertinent to their investigation of the post office inquiry. *See United States v. Knox,* 839 F.2d 285 (6th Cir.1988) (upholding an investigative detention that might have lasted up to 30 minutes). This reveals that the agents diligently "pursue[d] a means of investigation likely to confirm or dispel their suspicions quickly." *Avery,* 137 F.3d at 349. The agents neither physically touched nor handcuffed the De-

fendant until after they formally arrested him at the post office. Finding that none of the agents' weapons were visible, the district court nevertheless opined that a reasonable person would believe that law enforcement individuals are armed. However, as the Supreme Court recently noted, *because* of this very knowledge, even a visible holstered firearm is "unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." *United States v. Drayton,* 536 U.S. 194, 204–205, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (consequently, such a factor should receive little weight in the "seizure" analysis.). Although the Defendant is short and slight in stature while "at least two if not all three ... of the agents substantially outdistance the [D]efendant in height and weight," per the district court's finding, such physical disparities alone cannot transform an otherwise valid *Terry* stop into a *de facto* arrest. Moreover, the presence of two of Defendant Magana's companions while the agents questioned the Defendant reduced any intimidating effect resulting from the officers' frames.

The district court underscored that all three agents had "their attention focused upon" Defendant Magana "because he matched the postal clerk's description, and he lived in the apartment to which the package of illegal documents was addressed." Yet, the existence of such reasonable, articulable suspicion regarding an individual's criminal activity-which is necessary to justify a *Terry* stop-cannot automatically transform such a valid *Terry* stop into a *de facto* arrest; otherwise, every *Terry* stop, by its very nature, would be an arrest. *C.f. Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (holding that being the focus of law enforcement's investigation was not being "in custody" so as to trigger *Miranda* ).

In conducting the Fourth Amendment analysis, the district court erred in considering that Defendant Magana knew that he was an illegal alien and that an I.N.S. agent was present, and that the Defendant knew that the other agents, whom he knew to be law enforcement officers, were investigating criminal activity in which he was involved. The objective "seizure" analysis presupposes a reasonable, *innocent* person. *Florida v. Bostick,* 501 U.S. 429, 438, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *See Immigration and Naturalization Service v. Delgado,* 466 U.S. 210, 223 n. 3, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (finding implicitly that I.N.S. agents' questioning of individuals-some of whom were illegal aliens-as to their citizenship is insufficient to constitute a seizure). Moreover, the mere fact that officers identify themselves as law enforcement does not transform an otherwise valid *Terry* stop into a *de facto* arrest. *See Royer,* 460 U.S. at 497, 103 S.Ct. 1319 (finding such a fact alone insufficient to convert a consensual encounter into a seizure).

Even though Postal Inspector Wilson would have detained Defendant Magana "a little bit" had he attempted to leave, as the district court found, one cannot infer from this fact, as the district court did, that the *officers'* "demeanor, language and/or tone of voice" communicated that they might compel compliance with their request. The subjective intent of police is relevant to a Fourth Amendment analysis only to the extent that they have conveyed that intent to the confronted individual. *United States v. Rose,* 889 F.2d 1490, 1493 (6th Cir.1989); C.f. *Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138 (police officer's unarticulated plan is irrelevant to whether a suspect was "in custody" at a specific time.). It was clearly erroneous to conclude that the other officers, who testified that they would have permitted the Defendant to leave, somehow absorbed Wilson's subjective intent, which Wilson could only have manifested via his demeanor as no evidence shows that he ever spoke during this time. In any event, any objective manifestation from the officers that they would have slightly detained Defendant Magana would be consistent with a lawful *Terry* stop and, thus, could not constitute a *de facto* arrest.

The district court also considered that Defendant Magana knew that the agents had conducted the investigation that led to the arrest of the two other individuals who shared his apartment, one of whom was the Defendant's relative. However, in *United States v. Drayton,* police requested the defendant's consent to a search just seconds after arresting his companion, who had been sitting next to the defendant on the bus. 536 U.S. at 199, 122 S.Ct. 2105. Rejecting the defendant's argument that this was a seizure, the Supreme Court noted that the police's arrest of one individual does not mean that they have, thus, seized everyone around him; rather, if anything, the arrest of his companion should have put the defendant "on notice of the consequences of continuing the encounter by answering the officers' questions." *Id.* at 206, 122 S.Ct. 2105. Following this reasoning, the agents' arrest of two of Defendant Magana's roommates-which occurred a *few days* rather than a few seconds earlier-alone does not mean that the agents have, thus, seized the Defendant, let alone *constructively arrested* him. Moreover, here, the agents repeatedly informed Defendant Magana that he was not under arrest.

Based on the preceding discussion, which demonstrates the weight, if any, each of these factors receive in the Fourth Amendment analysis, it is clear that these factors are insufficient in the aggregate to support a determination that the agents constructively arrested Defendant Magana while they questioned him outside of his

apartment. Rather, the agents acted pursuant to a valid *Terry* investigative stop.

### B. Defendant Magana's Consent to the Show-up was Voluntary

■ We review the district court's factual findings in a suppression hearing for clear error. *Smith,* 263 F.3d at 581. Whether consent was voluntary is generally a question of fact that we review for clear error. *United States v. Guimond,* 116 F.3d 166, 169 (6th Cir.1997) (noting that we review the constitutionality of a search *de novo* when the district court determines the validity of consent to search "based upon the application of an overriding legal principle," and remanding to the district court to determine whether the defendant's consent was voluntary).

"[A]n illegal seizure, or arrest, can occur when officers order the suspect to accompany them to an area where he had not planned to go." *Bueno,* 21 F.3d at 125; *See Knox,* 839 F.2d at 289–290 (finding that the agent seized defendants when he immediately requested them to accompany him to the airport security office, but that reasonable suspicion justified such a *Terry* investigative stop); *Dunaway,* 442 U.S. at 212–216, 99 S.Ct. 2248 (holding that police transporting the defendant involuntarily to the police station for questioning was an unconstitutional *de facto* arrest lacking probable cause where police would have physically restrained the defendant had he tried to leave and where police failed to inform him that he was free to leave or question him briefly where they found him). However, the confronted individual may consent to move to a different location for investigative purposes. *See United States v. Garcia–Torres,* 1 Fed.Appx. 294 (6th Cir.2001) (holding that the defendant voluntarily consented to move from the location of an initial *Terry* investigative detention to a different location for further investigative purposes) (unpublished opinion). The government must show, by a preponderance of the evidence, through "clear and positive testimony," that any such consent was voluntary based on the totality of the circumstances; in particular, the government must show that the consent was "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *United States v. Worley,* 193 F.3d 380, 384–386 (6th Cir. 1999). The following factors are relevant to whether consent is valid: "the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *Id.* at 386. In particular, any consent that the suspected individual gives while being subject to an illegal seizure may be tainted and, thus, invalid. *Guimond,* 116 F.3d at 170–171; *See Royer,* 460 U.S. at 507–508, 103 S.Ct. 1319.

Here, the district court never explicitly found that the Defendant's consent to accompany the agents from the apartment building to the post office was involuntary. Rather, the district court opined that a "reasonable person in the [D]efendant's position would not have ... [felt] free not to accompany the agents to the post office for a show-up" and that the agents had seized the Defendant *at the time* that they asked him to accompany them to the post office. This reveals that the district court's implicit finding that Defendant Magana's consent was involuntary was inextricably intertwined with the court's explicit finding that the Defendant was then subject to an illegal seizure. Yet, as discussed above, no illegal seizure occurred so as to taint Defendant Magana's otherwise valid consent. Rather, "clear and positive" testimony demonstrates beyond a preponderance of the evidence that Defendant Magana voluntarily consented to accompa-

ny the agents from the apartment building to the post office.

Although Defendant Magana initially gave only equivocal consent, the Defendant, after learning exactly what the post office show-up regarded, then consented unequivocally by responding. "okay, okay," and freely accompanying the agents to the post office. Defendant Magana was of sufficient age and intelligence to consent validly. In *United States v. Grant*, we observed that the defendant, a Spanish-speaking alien, probably "felt compelled to answer the agents' questions and to submit to their demands" due to his alien status and his ignorance of American police practice. 920 F.2d 376, 383 (6th Cir.1990) (holding that agents subjected the defendant to *Terry* detentions lacking reasonable suspicion first when they initiated a second round of interrogation by awakening him and asking him to deplane and then when they "required" him to deplane and accompany them to the airport concourse as the defendant's consent was involuntary). Defendant Magana, like the defendant in *Grant*, is a Spanish-speaking alien.[4] However, unlike in *Grant*, the agents' repeated assurances to Defendant Magana that he was not under arrest, that he did not have to go with them if he did not want to, and that his accompaniment was completely voluntary were clearly sufficient to dispel any such ignorance of police practice that stemmed from his alien status. Moreover, the district court found that the Defendant's speaks and understands English "perfectly fine." Thus, Defendant Magana understood his right to refuse to consent. The agents did not coerce Defendant Magana into consenting simply by informing him that the show-up might "clear" him as a suspect-information that simply made the Defendant's consent more informed. Additionally, as to the nature and length of detention as well as the agents' use of any coercive conduct, the circumstances surrounding the incident did not render the Defendant's consent involuntary for reasons similar to those discussed above as to why such circumstances constituted a valid *Terry* detention, not an invalid *de facto* arrest.

In sum, the agents did not constructively arrest Defendant Magana while questioning him outside of his apartment but, rather, acted pursuant to a lawful *Terry* investigative detention. Thus, the Defendant was neither subject to a Fourth Amendment seizure requiring probable cause nor was he "in custody" for purposes of the *Miranda* doctrine while he was outside of the apartment. Defendant Magana voluntarily consented to accompany the agents from the apartment building to the post office for a show-up. Thus, we REVERSE the district court's suppression order.

---

4. As the voluntariness of consent does not depend upon whether the defendant acted in his ultimate self-interest, only Defendant Magana's alien status, not *illegal* alien status, is relevant; similarly, the Defendant's guilt concerning the post office inquiry is also irrelevant. *See United States v. Mendenhall*, 446 U.S. 544, 559, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).